STATE OF NORTH CAROLINA v. MICHAEL JEROME BRAXTON

No. 2A98

(Filed 13 July 2000)

**1. Appeal and Error— preservation of issues—constitutional issues—failure to challenge at trial—jurisdictional issue**

Although defendant did not challenge the constitutionality of the short-form murder indictment at trial, this issue is properly before the Court because a challenge to an indictment alleged to be invalid on its face that could deprive the trial court of jurisdiction may be made at any time.

**2. Homicide— first-degree murder—short-form indictments— constitutionality**

Although the short-form indictment used to charge defendant with first-degree murder did not allege the elements of premeditation, deliberation, and specific intent to kill, the trial court did not err in concluding the indictment was constitutional because defendant had notice that he was charged with first-degree murder and that the maximum penalty to which he could be subjected was death.

**3. Criminal Law— capital trial—comments by trial court on appellate review**

The trial court's references to appellate review before jury selection during a routine explanation of the court reporter's duties, and additional references to appellate review during jury voir dire, did not impermissibly imply to the jury that the Supreme Court would correct any errors the jury might make or relieve the jury of its responsibility.

**4. Jury— selection—capital trial—subdividing into panels**

The trial court did not err in a capital trial by subdividing the jury venire into panels of twenty-five people from which prospective jurors were called for individual voir dire because: (1) defendant never challenged the jury panel selection process and never informed the trial court of any objection to the alleged improper handling of the jury venires as required by N.C.G.S. § 15A-1211(c); and (2) even if the jury selection procedure violated the randomness requirement of N.C.G.S. § 15A-1214(a), defendant has not demonstrated on appeal how he was prejudiced by the procedure.

**5. Jury— selection—capital trial—questions concerning death penalty**

The prosecutor's repeated questioning about whether prospective jurors could be part of the "legal machinery" that could sentence defendant to the death penalty was not an impermissible attempt to "stake out" the jurors and did not dilute individual jurors' sense of responsibility for their sentencing decision because the prosecutor's question emphasized each juror's personal participation in the decision-making process.

**6. Jury— selection—capital trial—previous criminal record— improper attempt to "stake out" jurors**

The trial court did not abuse its discretion during voir dire of a capital trial by not allowing defendant to ask any prospective jurors whether they could be fair and impartial as to guilt or innocence knowing that defendant had previously been convicted of two first-degree murders and was serving two life sentences when he committed this murder, because the question improperly attempts to "stake out" what kind of verdict a juror would render under certain named circumstances not yet in evidence.

**7. Jury— peremptory challenges—capital trial—not racial grounds**

The trial court did not err in a capital trial by overruling defendant's objection to the State's use of seven consecutive peremptory challenges to strike from the jury seven black prospective jurors because defendant failed to establish a prima facie showing of purposeful discrimination in light of the prosecutor's minority acceptance rate of 47% at that point in the jury selection process.

**8. Evidence— hearsay—no prejudicial error**

Even if the trial court erred in a capital trial by admitting the hearsay testimony of the victim's mother and grandmother stating that the victim said he had been placed on lockup at a correctional center as a result of a back injury that prevented him from working, this error was not prejudicial because: (1) the prosecutor also elicited testimony from a police officer on direct examination that the victim had been placed on lockup for disrespecting an officer; (2) on cross-examination, another officer testified the victim was on lockup for not going to work; (3) both the prosecutor and defendant presented evidence to the jury regarding the actual reasons for the victim's lockup status; and (4)

defendant was not precluded from presenting additional evidence regarding the victim's status or from rebutting prosecutorial evidence of the victim's peaceful character.

**9. Appeal and Error— preservation of issues—offer of proof**

Although defendant contends the trial court erred in a capital trial by limiting an officer's testimony on cross-examination and excluding testimony that the victim was on lockup at a correctional unit for profanity and disrespect, defendant has failed to preserve this issue for appellate review under N.C.G.S. § 8C-1, Rule 103(a)(2) because: (1) an offer of proof was necessary since the substance of the excluded testimony was not necessarily apparent from the context of the question asked; and (2) an attempt by the Supreme Court to presume the substance or prejudicial effect of the excluded testimony would be speculation.

**10. Criminal Law— bailiff—participation in courtroom demonstration**

Although prejudice is conclusively presumed where a witness for the State acts as custodian or officer in charge of the jury in a criminal trial, the trial court did not violate defendant's right to a fair and impartial jury in a capital trial by allowing the bailiff to participate in a courtroom demonstration in the role of the murder victim because: (1) defendant cites no evidence in the transcript or record that supports the assertion that the bailiff was the sworn officer in charge of the jury, and mere presence in the courtroom is not sufficient; (2) the bailiff was not called to testify as a witness, and he did not convey any communication to the jury through his participation in the courtroom demonstration; and (3) the likelihood that the outcome of the trial would have been different had the bailiff not participated in the demonstration is de minimus.

**11. Evidence— relevancy—screams, crime scene, and demeanor—state of mind—intent to kill**

The trial court did not abuse its discretion in a capital trial by admitting the testimony of several officers about the victim's screams during the murder, the appearance of the crime scene, and defendant's behavior and demeanor immediately following the murder, because the testimony was relevant under N.C.G.S. § 8C-1, Rule 402 to negate defendant's claim of self-defense, as well as to establish his state of mind and intent to kill.

STATE v. BRAXTON

[352 N.C. 158 (2000)]

## 12. Evidence— lay opinion—shorthand statements of fact

The testimony of several officers in a capital trial about the victim's screams during the murder, the appearance of the crime scene, and defendant's behavior and demeanor immediately following the murder, did not amount to improper lay opinion under N.C.G.S. § 8C-1, Rule 701 because the testimony of these witnesses was admissible as shorthand statements of fact.

## 13. Evidence— duplicative testimony—availability of weapons in prison

The trial court properly exercised its discretion under N.C.G.S. § 8C-1, Rule 611(a) in a capital trial when it excluded testimony from defendant and two other witnesses regarding the general availability of weapons at the correctional center to assist defendant's claim of self-defense for a murder committed in prison because: (1) an officer already testified that he did not know how frequently the victim's cellblock was searched and that he could not recall whether he or any other officers had ever found knives during a search of the victim's cellblock, and the trial court expressly stated defendant could present other evidence that tended to establish the availability of weapons in the prison; (2) defendant had already testified about the availability of knives and the dangerousness of the inmates at the correctional unit, and any further testimony from defendant would have been duplicative; and (3) the witness who was a former North Carolina Prison Legal Services attorney was in no better position than the jury to give his opinion about the prevailing conditions in the correctional unit at the time of the murder.

## 14. Evidence— hearsay—state of mind exception

The trial court did not commit prejudicial error in a capital trial by allowing a statement from one inmate to another inmate that he was going to approach defendant about straightening out the victim's debt, because the statement was not hearsay since it was admissible under N.C.G.S. § 8C-1, Rule 803(3) as evidence of that inmate's then-existing intent to engage in a future act.

## 15. Evidence— hearsay—initially allowed—subsequently excluded

The trial court did not commit prejudicial error in a capital trial by allowing testimony of an inmate, stating that an anonymous inmate asked defendant why he killed the victim, because the trial court's initial overruling of defendant's objection to this

hearsay testimony was subsequently corrected, and the inadmissible hearsay was properly excluded by the trial court.

## 16. Evidence— hearsay—not truth of matter asserted—subsequent conduct

The trial court did not commit prejudicial error in a capital trial by allowing testimony of an inmate's statement to defendant shortly before the murder that the victim was in the shower, because the statement was not hearsay since it was not offered to prove the truth of any matter asserted, but instead to explain the subsequent conduct of defendant in walking toward the shower area.

## 17. Evidence— hearsay—not testifying to any statements—motive

The trial court did not commit prejudicial error in a capital trial by allowing testimony of an inmate about the victim's $17.00 debt owed to defendant because the statement did not constitute hearsay since the inmate did not testify to any statements made by the victim, and the testimony was relevant to establish a possible motive for the murder.

## 18. Evidence— corroboration—self-defense claim—no right in advance of testimony of a witness

The trial court did not err by initially excluding evidence that an inmate told defendant that he had given a knife to the victim, and that the same inmate also told another inmate that he had given a knife to the victim, because: (1) there is no right to corroboration evidence of a self-defense claim in advance of the testimony of a witness; and (2) defendant was not precluded from presenting evidence that corroborated his self-defense claim after defendant testified he believed the victim had a knife at the time of the murder and that he killed the victim in self-defense, nor can he show he suffered any prejudice.

## 19. Evidence—     prior     convictions—defendant—cross-examination

The trial court did not err in a capital trial by allowing the prosecutor to cross-examine defendant about the details of his prior convictions because: (1) evidence which would otherwise be inadmissible may be permissible on cross-examination to correct inaccuracies or misleading omissions in defendant's testimony or to dispel favorable inferences arising therefrom, and

defendant's testimony on direct examination tended to minimize the seriousness of his criminal involvement; and (2) the prosecutor did not improperly ask defendant about tangential circumstances of the crimes.

## 20. Evidence— prior convictions—defense witness—cross-examination

The trial court did not err in a capital trial by allowing the prosecutor to cross-examine a defense witness about the details of his prior convictions because: (1) the prosecutor's questions related to the factual elements of the crime, rather than the tangential circumstances of the crime; (2) the witness was not completely forthright and accurate in testifying about his prior convictions on direct examination; (3) the prosecutor asked only about weapons, not about other circumstances of the crimes, and thereby clarified the nature of the crimes the witness tended to minimize; (4) even if the questions exceeded the proper scope of inquiry under N.C.G.S. § 8C-1, Rule 609(a), any error was not prejudicial since the questions were asked of a defense witness and not the defendant; and (5) no reasonable possibility exists that a different result would have been reached at trial absent the alleged error.

## 21. Evidence— prison infractions—character—untruthfulness

The trial court did not abuse its discretion under N.C.G.S. § 8C-1, Rule 608(b) in a capital trial by allowing the prosecutor to cross-examine defendant with respect to his prison infractions for weapon possessions, provoking an assault, disobeying an order and fighting, and making a verbal threat, because: (1) the record reveals the purpose of the prosecutor's inquiry was to show defendant's character for untruthfulness; (2) the probative value of the first infraction for weapon possession was not substantially outweighed by the danger of unfair prejudice under N.C.G.S. § 8C-1, Rule 403; and (3) defendant is not entitled to review of the other prison infractions by plain error analysis since he did not object to the prosecutor's questions and he did not argue plain error.

## 22. Evidence— prison infractions—character—no plain error

Even if the prosecutor's questions about a defense witness's prison infractions, including stabbing someone with a pen, disobeying an order, three separate occasions for fighting, and provoking a fight, exceeded the permissible scope of impeachment

under N.C.G.S. § 8C-1, Rule 608(b), defendant failed to object during this testimony and admission of this testimony did not rise to the level of plain error.

### 23. Witnesses— expert testimony—defendant's state of mind

The trial court did not err in a capital trial by not allowing defendant's expert to give his opinion as to defendant's state of mind at the time of the homicide, to negate the elements of premeditation and deliberation based on the effect of the long-term imprisonment of defendant, because: (1) the expert was in no better position than the jury to determine the reasonableness of defendant's apprehension; and (2) the testimony would tend to confuse, rather than help, the jury in understanding the evidence and determining the facts in issue. N.C.G.S. § 8C-1, Rule 702.

### 24. Evidence— cross-examination—following attempt to withdraw testimony

The trial court did not err in a capital trial by permitting the prosecutor to cross-examine the defense expert, after defendant attempted to withdraw the expert as a witness when the trial court sustained the prosecutor's objection to the expert's testimony regarding defendant's alleged "prison psychosis," because: (1) the expert had already testified about matters other than his credentials as an expert; and (2) the prosecutor properly impeached the expert's credibility without asking any questions or eliciting any testimony that related to the evidence excluded by the trial court.

### 25. Criminal Law— prosecutor's argument—characterization of defense expert's testimony as incomplete

The trial court did not abuse its discretion in failing to intervene ex mero motu in a capital trial during the prosecutor's closing argument, based on the characterization of the defense expert's testimony as incomplete, because the evidence was conflicting concerning defendant's intent and state of mind at the time of the murder, and counsel is allowed wide latitude in the argument of hotly contested cases.

### 26. Criminal Law— defendant's argument—court's reversal of ruling

The trial court did not abuse its discretion during a capital trial by prohibiting defense counsel from informing the jury during closing arguments that the trial court had reversed its earlier

ruling in which it refused to instruct on the lesser-included offenses of second-degree murder and voluntary manslaughter, and by denying defendant's motion for a mistrial, because: (1) the trial court acted appropriately to ensure that its decision to instruct on the lesser-included offenses would not affect the proceedings or result in the appearance of partiality; (2) the trial court reversed its ruling in ample time for defendant to revise his closing argument in order to avoid drawing attention to the disparities between the two arguments; and (3) defendant cannot show he suffered any prejudice under N.C.G.S. § 15A-1443(c) since the trial court instructed the jury on the lesser-included offenses according to defendant's request.

**27. Criminal Law— prosecutor's argument—comment on defendant's self-defense claim**

The trial court did not commit prejudicial error by failing to intervene ex mero motu during the prosecutor's closing arguments in a capital trial because the prosecutor's assertion that defendant's self-defense claim is "vomit on the law of North Carolina" constitutes a permissible expression of the State's position that the jury's determination that defendant acted in self-defense would be an injustice in light of the overwhelming evidence of defendant's guilt.

**28. Criminal Law— prosecutor's argument—characterization of defendant**

The trial court did not commit prejudicial error by failing to intervene ex mero motu during the prosecutor's closing arguments in a capital trial, based on the prosecutor's characterization of defendant as "this thing" and "cowardly," because: (1) the prosecutor's comments regarding defendant's cowardice were connected to the evidence which suggested that the victim was physically smaller and weaker than defendant, and the victim was naked and defenseless at the time of the killing; and (2) the prosecutor's one-time isolated description of defendant as "that thing" was not grossly improper.

**29. Criminal Law— prosecutor's argument—advocate for State and victim**

The trial court did not commit prejudicial error by failing to intervene ex mero motu during the prosecutor's closing arguments in a capital trial, based on the prosecutor arguing he spoke for the State and for the victim, because: (1) the Supreme Court

has previously found no gross impropriety when a prosecutor has argued that he speaks for the victim; and (2) the prosecutor's argument merely reminded the jurors that he was advocating for both the State and the victim.

### 30. Homicide— instruction—shank as dangerous weapon

The trial court did not err in a capital trial by instructing the jury that a shank was a dangerous weapon as a matter of law because: (1) the Supreme Court has previously rejected this same argument, which alleged that the instruction creates a conclusive presumption on an element of the offense relieving the State of its burden of proof; and (2) defendant failed to bring forth any new argument.

### 31. Evidence— prior crimes—lack of remorse—officer's testimony

The trial court did not commit plain error in a capital sentencing proceeding by allowing an officer to testify about defendant's demeanor and alleged lack of remorse during a prior investigation resulting in defendant's two prior convictions for murder, because: (1) the testimony was based on the officer's personal observation of defendant during the investigation for a period of "five or six hours"; and (2) the officer's opinion that defendant demonstrated no remorse for his previous crimes is competent, relevant evidence of defendant's mental condition.

### 32. Sentencing— capital—mitigating circumstances—childhood difficulties, caring relationship with sister, psychological trauma

The trial court did not err in a capital sentencing proceeding by excluding evidence from defendant's younger sister concerning defendant's childhood difficulties, his caring relationship with his younger sister, and the psychological trauma caused by his biracial background, because: (1) defendant failed to preserve this issue for appellate review under N.C.G.S. § 8C-1, Rule 103(a)(2) since he did not make an offer of proof to the witness' possible answers to the objectionable questions and the "essential content" and "significance" of the excluded testimony is not obvious; and (2) even if the issue had been properly preserved, the trial court did not prohibit defense counsel from asking defendant's sister about what defendant did for her as a father figure in her life and about her personal observations of defendant's reactions to biracial incidents during his childhood.

STATE v. BRAXTON

[352 N.C. 158 (2000)]

## 33. Sentencing— capital—mitigating circumstances—childhood psychological abuse and self-hatred

The trial court did not abuse its discretion in a capital sentencing proceeding by restricting testimony from defendant's mother concerning defendant's childhood psychological abuse and self-hatred as a result of being biracial, because the trial court merely restricted the testimony to the witness' personal observations of defendant's reactions and emotional state as a child, rather than allowing her to testify about defendant's feelings.

## 34. Discovery— expert testimony—exclusion—failure to comply with discovery order

The trial court did not err in a capital sentencing proceeding by excluding the testimony of an expert witness at the sentencing hearing concerning defendant's mental condition at the time of the offense, because: (1) defendant violated a discovery order requiring defendant to disclose, five working days in advance of testimony, mental examination reports prepared by witnesses whom defendant planned to call to testify; (2) defendant had two other mental health experts available, whose testimony would have been fully admissible at the sentencing proceeding; and (3) defendant cannot show he was prejudiced when he made a tactical decision not to disclose the report until after the guilty verdict.

## 35. Evidence— expert testimony—offer of proof—report in evidence

The trial court did not improperly refuse to allow defendant to make an offer of proof of the proposed testimony of an expert witness during a capital sentencing proceeding, because: (1) the trial court admitted the expert's report of her complete psychological assessment of defendant; (2) the trial court gave defendant ample opportunity on voir dire to question the expert about the substance of her report for a complete offer of proof as required by N.C.G.S. § 8C-1, Rule 103(a)(2); and (3) defendant was not prejudiced since the records would have been admissible independently of her testimony as relevant evidence of defendant's character.

**36. Sentencing— capital—failure to submit mitigating circumstance—mental or emotional disturbance**

The trial court did not err in a capital sentencing proceeding by failing to submit the mitigating circumstance under N.C.G.S. § 15A-2000(f)(2) that the murder was committed while defendant was under the influence of mental or emotional disturbance, because: (1) the reasons defendant offered to show why he carried a knife revealed a rational state of mind as opposed to a mind oppressed by extreme paranoia and fearfulness; and (2) sheer anger or the inability to control one's temper is neither mental nor emotional disturbance as contemplated by this mitigator.

**37. Sentencing— capital—failure to submit mitigating circumstance—capacity to appreciate criminality or conform conduct**

The trial court did not err in a capital sentencing proceeding by failing to submit the mitigating circumstance under N.C.G.S. § 15A-2000(f)(6) that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, because: (1) the record is devoid of any evidence that defendant's paranoia and fear of violence from the prison environment so impaired him as to prevent his understanding the criminality of his conduct or that it affected his ability to control his actions; (2) defendant testified he completed a psychological course and had obtained a "4.0" grade; (3) defendant owned and operated a canteen, card games, and a loan business, all of which were illegal or against prison regulations; and (4) the evidence that defendant pulled a knife in the shower when he approached the victim, since he had previously been told the victim had been given a knife, does not show that defendant had a mental disorder to the degree that it affected his ability to understand and control his actions at the time he committed the murder.

**38. Criminal Law— prosecutor's argument—capital sentencing—biblical references**

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the prosecutor's closing arguments, based on the prosecutor's use of biblical references, because: (1) the prosecutor properly emphasized at the beginning of his closing argument that defendant's sentence

would be recommended based upon the "law of North Carolina, not biblical law," (2) the prosecutor's argument that "I hope nobody has the gall to stand up here and tell you that the law of North Carolina is against the Bible" does not improperly imply that the Bible required death upon a determination that a murder occurred; (3) the prosecutor's statement that "defendant by his own conduct has determined his fate" does not diminish the jury's responsibility in recommending the death sentence, but instead informs the jury of its duty to consider the evidence supporting the aggravating and mitigating circumstances as well as defendant's conduct; and (4) as anticipated by the prosecutor, defense counsel also made biblical references during his closing argument.

### 39. Sentencing— capital—prosecutor's argument—mitigating circumstances

Although the prosecutor misstated the law in a capital sentencing proceeding during his closing argument when he informed the jurors that it was their duty to determine whether any of the "29 so-called mitigating circumstances" had any mitigating value, since the submitted statutory mitigating circumstance of age would have mitigating value as a matter of law if it was found by the jury to exist, the sentencing hearing was not so infected with unfairness by the prosecutor's comments as to violate defendant's due process rights because his subsequent comments accurately reflected the distinction between statutory and nonstatutory mitigating circumstances.

### 40. Criminal Law— defendant's argument—quoting secular sources—relevancy

The trial court did not err in a capital sentencing proceeding by prohibiting defense counsel from quoting from secular sources during his closing argument, specifically from a letter written by Reverend Jesse Jackson to the "Faith Community" in South Carolina making a moral appeal for the life of a woman who murdered her two young children and blamed a black man, because the trial court afforded counsel ample opportunity to argue using ideas and quotes from secular sources and properly prohibited counsel from arguing the facts of other cases since those facts are not pertinent to any evidence in this case and are, thus, improper for jury consideration.

**41. Sentencing— capital—mitigating circumstances—defendant's age—mitigating value**

The trial court did not commit plain error in a capital sentencing proceeding by failing to instruct the jury that the statutory mitigating circumstance of age has mitigating value because the trial court's instructions properly distinguished between statutory and nonstatutory mitigating circumstances, and informed the jurors of their duty under the law.

**42. Sentencing— capital—death penalty not disproportionate**

The trial court did not err by imposing the death penalty in a first-degree murder case because: (1) defendant was convicted of premeditated and deliberated murder; (2) the jury found aggravators pertaining to two previous capital felonies and five previous violent felonies; and (3) the facts show defendant repeatedly stabbed a totally defenseless man in the prison shower for money owed him.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Wright, J., on 20 November 1997 in Superior Court, Halifax County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 15 May 2000.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*David G. Belser for defendant-appellant.*

PARKER, Justice.

Defendant Michael Jerome Braxton was indicted on 30 September 1996 for first-degree murder in the killing of victim Dwayne Maurice Caldwell. Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury recommended the sentence of death for the murder; and the trial court entered judgment accordingly.

The State's evidence at trial tended to show that in August of 1996 defendant and the victim were both inmates in block A of unit 4 at Caledonia Correctional Center ("Caledonia") in Tillery, Halifax County, North Carolina. Defendant owned the illegal canteen operation in block A. Defendant also owned and operated card games and

a loan business in violation of prison regulations. In August of 1996 the victim owed defendant $17.00 for items charged at defendant's canteen. Michael Thomason, another inmate, testified that, three days prior to the killing, defendant harassed the victim for the money owed. Thomason and other inmates pooled their money to pay the victim's debt. Thomason gave the money to defendant, but defendant gave it back. According to Thomas McCombs, another inmate, defendant would not accept the money because "it was a principle thing." McCombs also testified defendant told him that he was going to "hurt [the victim]."

On the afternoon of 18 August 1996, the unit 4 inmates were released to the prison yard for exercise. While the others were in the prison yard, Officer Roy W. Brown, Jr. escorted the victim, who had been confined to his cell on administrative lockup, to the shower. Officer Brown searched the victim and the shower area and found no contraband or weapons. Officer Brown left the victim alone while he showered.

At the same time, defendant and other inmates were outside in the prison yard playing a card game. As they were playing, inmate Ronald Moore took defendant aside and told him "that guy" was in the shower. Shortly thereafter, defendant left the card game and headed toward block A. Inmate McCombs testified that before defendant went into block A, he saw defendant reach down and pull up his sock, where he had a "blade." McCombs saw defendant step into the shower and stab the victim "like a mad man" approximately eighteen to twenty times, using a second knife he had hidden in the waistband of his pants. Inmate Thomason testified that he saw defendant stab the victim two more times with both hands on the knife after the victim was down.

After leaving the victim in the shower for approximately twelve to fifteen minutes, Officer Brown heard screams from the shower area. Officer Brown entered the shower and sprayed pepper mace on both defendant and the victim. Officer Brown testified that he saw defendant, who was wearing work gloves, stabbing the victim with a homemade knife known as a "shank." After the victim fell out of the shower, defendant then kicked him repeatedly in the head and chest area and stabbed him in the chest and abdomen. Even though defendant's vision was impaired by the pepper spray, he felt around for the victim's body with his left hand and continued to stab the victim. Defendant eventually stopped his assault on the victim, threw the

shank down, and ran out of the shower area. At the infirmary, the victim showed no signs of life. A medical examination of defendant revealed no apparent injuries on his body. Corrections Officer Horace Aycock testified that he and other officers, including Officer Brown, conducted a search for weapons in unit 4. They found a shank in the shower area, a pair of work gloves on the floor near the control room to block A, and a second shank wrapped in a wet towel in the light fixture of the open bathroom cell.

Dr. Louis A. Levy, a pathologist and medical examiner, performed the autopsy on the victim's body. He testified that the victim had thirteen separate stabs and cuts on both sides of his chest, both arms, the index finger of his right hand, his right wrist, and his mouth. All of the victim's flexor tendons had been severed in the right wrist; and the victim's lungs, heart, and liver had been punctured. Dr. Levy opined that the cause of death was stab wounds to the heart and lungs and subsequent exsanguination. Dr. Levy further opined that the wounds were caused by two different weapons: The slicing of the right wrist was consistent with a knife that was sharpened on both sides, while the wound in the right shoulder was consistent with a weapon that was sharpened at the point but dull on both sides.

Defendant testified at trial as follows: Although defendant and the victim had argued about the money owed, defendant eventually told the victim on several occasions that he forgave the debt. However, the victim, while confined to his cell in administrative lockup, tried to provoke defendant into an argument and flashed a knife at him. Defendant testified that, on the afternoon of 18 August 1996, he was playing cards in the prison yard; and he had a knife "just in case an argument [broke] out at the game." Defendant stated that most inmates carry a knife in prison and that he always carried his knife in his glove, especially to card games, as a safety measure. While playing cards, another inmate told defendant that the victim had been given a knife. Defendant then entered block A and heard someone in the shower make an obscene comment to him. Defendant recognized the person in the shower as the victim. Defendant testified that he told the victim, "I'm about burned out on your mouth"; and the victim told defendant to "come on up here and get some then. I got something for you anyway." After defendant stepped into the shower and saw the victim with a towel in his hand, defendant pulled his knife out of one of his gloves, which were in his back pocket. Defendant "[felt]

like that [the victim] must have had a knife in his hand" since he had been told earlier that someone had given the victim a knife. However, defendant admitted that he never actually saw the victim with a knife.

Additional facts will be presented as needed to discuss specific issues.

## JURISDICTIONAL ISSUE

[1] Defendant contends that the charges against him should have been dismissed for the reason that the short-form murder indictment was constitutionally insufficient to charge him with first-degree murder. We initially address whether this issue is properly before this Court. Defendant did not contest the murder indictment at trial. Constitutional questions "not raised and passed upon in the trial court will not ordinarily be considered on appeal." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982). A defendant waives an attack on an indictment when the validity of the indictment is not challenged in the trial court. *See State v. Wallace*, 351 N.C. 481, 503, 528 S.E.2d 326, 341 (2000). "However, where an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it was not contested in the trial court." *Id.* Therefore, this issue is properly before this Court.

[2] Citing *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), defendant argues that the short-form indictment was unconstitutional since it failed to allege all the elements of first-degree murder, namely, "premeditation, deliberation, and specific intent to kill." Defendant also argues that without an allegation of premeditation and deliberation, the indictment failed to allege facts necessary to impose the maximum penalty for murder.

The indictment against defendant for murder contained the following language:

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above [Michael Jerome Braxton] unlawfully, willfully and feloniously and of malice aforethought did kill and murder DWAYNE MAURICE CALDWELL.

The indictment also stated: "Offense in violation of G.S. 14-17." This indictment complied with N.C.G.S. § 15-144, which provides for a short-form version of an indictment for murder as follows:

> In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the person accused, and the county of his residence, the date of the offense, the averment "with force and arms," and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law; . . . and any bill of indictment containing the averments and allegations herein named shall be good and sufficient in law as an indictment for murder or manslaughter, as the case may be.

N.C.G.S. § 15-144 (1999). An indictment that complies with the requirements of N.C.G.S. § 15-144 will support a conviction of both first-degree and second-degree murder. *See State v. King*, 311 N.C. 603, 608, 320 S.E.2d 1, 5 (1984). In *Apprendi v. New Jersey*, —— U.S. ——, ——, —— L. Ed. 2d ——, ——, 2000 WL 807189, at *7 (June 26, 2000) (No. 99-478), the United States Supreme Court, in examining the procedural safeguards necessary to protect a criminal defendant's constitutional right to due process when charged with violation of a state criminal statute, recently held that " 'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " *Id.* at ——, —— L. Ed. 2d at ——, 2000 WL 807189, at *7 (No. 99-478) (quoting *Jones*, 526 U.S. at 243 n.6, 143 L. Ed. 2d at 326 n.6). Defendant contends that premeditation and deliberation must be alleged in the short-form indictment as facts that would increase the maximum penalty from life imprisonment for second-degree murder to the death penalty for first-degree murder. However, this Court has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions. *See, e.g., State v. Kilpatrick*, 343 N.C. 466, 472, 471 S.E.2d 624, 638 (1996); *State v. Avery*, 315 N.C. 1, 12-14, 337 S.E.2d 786, 792-93 (1985). This Court has also held that the short-form indictment is sufficient to charge first-degree murder on the basis of any of the theories, including premeditation and deliberation, set forth in N.C.G.S. § 14-17, which is referenced on the short-form indictment. *See State v. Leroux*, 326

**STATE v. BRAXTON**

[352 N.C. 158 (2000)]

N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied,* 498 U.S. 871, 112 L. Ed. 2d 155 (1990); *State v. Brown,* 320 N.C. 179, 192, 358 S.E.2d 1, 11, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *Avery,* 315 N.C. at 14, 337 S.E.2d at 793. The crime of first-degree murder and the accompanying maximum penalty of death, as set forth in N.C.G.S. § 14-17 and North Carolina's capital sentencing statute, are encompassed within the language of the short-form indictment. We, therefore, conclude that premeditation and deliberation need not be separately alleged in the short-form indictment. Further, the punishment to which defendant was sentenced, namely, the death penalty, is the prescribed *statutory maximum punishment for first-degree* murder in North Carolina. Thus, no additional facts needed to be charged in the indictment. Given the foregoing, defendant had notice that he was charged with first-degree murder and that the maximum penalty to which he could be subjected was death. Moreover, under the law of this State, whenever a defendant is charged with murder, questions of fact related to guilt or innocence and to capital sentencing must be determined by the jury; and the State has the burden of proving all elements of the crime and aggravating circumstances beyond a reasonable doubt. Nothing in *Apprendi,* in our judgment, alters this prior case law. Accordingly, we overrule this assignment of error.

## JURY SELECTION

[3] In his first assignment of error, defendant contends that the trial court's repeated references to appellate review violated defendant's rights under the Eighth Amendment to the Constitution of the United States by diluting the responsibility of the jury. *See Caldwell v. Mississippi,* 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 239 (1985).

Prior to jury selection, the trial court instructed the prospective jurors about court procedures as follows:

> The court reporter this week is Mark Garvin of Nash County. Mr. Garvin will be taking down and transcribing as he is at this time everything that I say in the courtroom, during the trial and the hearing of various motions. And should a mistake or question be made so the Supreme Court of North Carolina can review it. This is also true so that I may review it, should I wish to hear something that a witness or an attorney said.

The trial court later referred to appellate review several times during jury *voir dire* by saying "[l]et the record reflect for appellate review" or "for the appellate record." After defendant objected to these refer-

ences, the trial court told the jurors with regard to appellate review, "I want to make that perfectly clear. That's only should things go adverse to the defendant. There may be no appellate review in this case."

In *State v. McKoy*, 323 N.C. 1, 8, 372 S.E.2d 12, 15 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), the trial court explained to the jury that the court reporter "can type up a transcript of a trial and they mail it down to the Supreme Court and the Supreme Court can review what we're doing up here in Stanly County." Similarly, in *State v. Gray*, 347 N.C. 143, 163, 491 S.E.2d 538, 544 (1997), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998), the trial court explained that the court reporter had a duty "to take down and transcribe everything that's said in the courtroom during the trial and the hearing of motions so that the judge can review, or should it be appealed, any matter to the Supreme Court in Raleigh." In both cases we rejected the defendants' arguments that the instructions violated their constitutional rights. *See id.*; *McKoy*, 323 N.C. at 12, 372 S.E.2d at 17. We concluded in each case that the trial court's "brief comment—at the outset of the trial and in the context of an explanation of the court reporter's duties—could not have influenced, adversely to defendant, the jury's perception of its responsibility for its decisions." *McKoy*, 323 N.C. at 12, 372 S.E.2d at 17.

Similarly, in this case the trial court's statements, made by the judge before jury selection did not impermissibly imply to the jury that this Court would correct any errors the jury might make or relieve the jury of its responsibility. *See Gray*, 347 N.C. at 163, 491 S.E.2d at 544. The trial court's passing references to appellate review and the curative statement, made during *voir dire*, likewise do not invalidate defendant's death sentence. *See McKoy*, 323 N.C. at 13, 372 S.E.2d at 18. Therefore, this assignment of error is overruled.

[4] Next, defendant contends that the trial court erroneously subdivided the jury venire into panels from which prospective jurors were called for individual *voir dire*. Defendant contends that this violated the provisions of N.C.G.S. § 15A-1214 and entitles him to a new trial. We disagree.

The North Carolina jury selection statute provides, in pertinent part, as follows:

(a) The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection

STATE v. BRAXTON

[352 N.C. 158 (2000)]

which precludes advance knowledge of the identity of the next juror to be called. When a juror is called and he is assigned to the jury box, he retains the seat assigned until excused.

N.C.G.S. § 15A-1214(a) (1999). In this case, the trial court subdivided the large venire into smaller panels of twenty-five people. These panels were determined by the courtroom clerk calling the names, at the judge's instruction, by "lot or random." The trial court then directed the clerk to call prospective jurors to the jury box randomly from within a panel. Defendant argues this procedure resulted in advance knowledge of the identity of the next juror to be called when only one prospective juror remained in each panel. Further, defendant contends the trial court erred by assigning prospective jurors Alnita Simmons, Walter Arrington, Jamal Robinson, and Dennis Carter to panel G rather than simply excusing these jurors after they provided excuses regarding potential time and work conflicts.

"When a trial court acts contrary to a statutory mandate, the defendant's right to appeal is preserved despite the defendant's failure to object during trial." *State v. Lawrence*, 352 N.C. 1, 13, —— S.E.2d ——, ——, (2000); *see also State v. Jones*, 336 N.C. 490, 497, 445 S.E.2d 23, 26 (1994). However, a defendant's challenge to the jury panel must satisfy the requirements of N.C.G.S. § 15A-1211, which provides that a challenge:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c) (1999). In this case, defendant never followed this specific procedure. The record reveals that defendant never challenged the jury panel selection process and never informed the trial court of any objection to the allegedly improper handling of the jury venires. *See State v. Workman*, 344 N.C. 482, 499, 476 S.E.2d 301, 310 (1996). In light of defendant's failure to follow the procedures clearly set out for jury panel challenges and his failure to alert the trial court to the challenged improprieties, we hold that defendant failed to preserve this issue for appellate review. *See State v. Atkins*, 349 N.C. 62, 102-03, 505 S.E.2d 97, 122 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999).

Moreover, even if it be assumed *arguendo* that the jury selection procedure violated the randomness requirement of N.C.G.S. § 15A-1214(a), defendant has not demonstrated on appeal how he was prejudiced by the procedure. This assignment of error is overruled.

[5] Defendant next assigns error to the prosecutor's repeated questioning about whether prospective jurors could be part of the "legal machinery" that would sentence defendant to the death penalty. Defendant claims this questioning constituted an impermissible attempt to "stake out" the jurors. Defendant also argues that the term "legal machinery" diluted the individual jurors' sense of responsibility for their sentencing decision in violation of *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, and *State v. Jones*, 296 N.C. 495, 500, 251 S.E.2d 425, 429 (1979).

In *State v. Willis*, 332 N.C. 151, 182, 420 S.E.2d 158, 173 (1992), and *State v. Porter*, 326 N.C. 489, 503, 391 S.E.2d 144, 154 (1990), this Court held that such questions did not minimize the importance of the jury or diminish the jury's responsibility for the decision to impose death. We explained that "the prosecutor's question emphasized each juror's personal participation in the decision-making process." *Porter*, 326 N.C. at 503, 391 S.E.2d at 154. Thus, in light of our previous holdings, we cannot conclude that the prosecutor's use of the term "legal machinery" was improper. This assignment of error is without merit and is, therefore, overruled.

[6] Next, defendant contends that the trial court abused its discretion during *voir dire* by not allowing him to ask any prospective jurors whether they could be fair and impartial as to guilt or innocence knowing that defendant had previously been convicted of two first-degree murders and was serving two life sentences when he committed this murder. Defendant argues that he should have been permitted the opportunity to determine whether the jurors would follow the trial court's instruction to consider defendant's prior convictions only as impeachment evidence. Defendant contends that this question was permissible under *Morgan v. Illinois*, 504 U.S. 719, 733, 119 L. Ed. 2d 492, 506 (1992), because the question "inquired into whether a juror could be fair and impartial and whether predetermined views regarding the death penalty would substantially impair that prospective juror's ability to serve." *State v. Kandies*, 342 N.C. 419, 441, 467 S.E.2d 67, 79, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). After a careful review of the transcript of *voir dire*, we find this assignment to be without merit.

## STATE v. BRAXTON

[352 N.C. 158 (2000)]

"Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided. . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances." *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980); *see also State v. Robinson*, 339 N.C. 263, 273, 451 S.E.2d 196, 202 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995); *State v. Yelverton*, 334 N.C. 532, 541-42, 434 S.E.2d 183, 188 (1993). The question posed in this case does not amount to a proper inquiry into whether the juror could follow the law as instructed by the trial judge. *See Robinson*, 339 N.C. at 273, 451 S.E.2d at 202. Rather, the question is an attempt to determine what kind of verdict a juror would render under certain named circumstances not yet in evidence, namely, two prior convictions of first-degree murder and two life sentences. *See id.*; *State v. Skipper*, 337 N.C. 1, 23, 446 S.E.2d 252, 264 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). We have previously held that "staking out" what the jurors' decision will be under a particular set of facts is improper. *See State v. Simpson*, 341 N.C. 316, 336, 462 S.E.2d 191, 202 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996); *Skipper*, 337 N.C. at 23-24, 446 S.E.2d at 264. Thus, we find this assignment of error to be without merit.

[7] Defendant next assigns error to the trial court's overruling of defendant's objection to the State's alleged impermissible use of peremptory challenges to strike from the jury seven black prospective jurors solely on account of their race. Article I, Section 26 of the Constitution of North Carolina prohibits the use of peremptory challenges for racially discriminatory reasons, *see State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999), as does the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *see Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986).

In *Batson* the United States Supreme Court established a three-part test to determine if the prosecutor has engaged in impermissible racial discrimination in the selection of jurors. *See Hernandez v. New York*, 500 U.S. 352, 358, 114 L. Ed. 2d 395, 405 (1991) (citing *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89). First, the defendant must establish a *prima facie* case that the State has exercised a peremptory challenge on the basis of race. *See id.* Second, once the *prima facie* case has been established by the defendant, the burden shifts to the State to rebut the inference of discrimination by offering a race-neutral explanation for attempting to strike the juror in question. *See*

*id.* at 358-59, 114 L. Ed. 2d at 405; *State v. Gaines,* 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997). The explanation must be clear and reasonably specific, but " 'need not rise to the level justifying exercise of a challenge for cause.' " *Porter,* 326 N.C. at 498, 391 S.E.2d at 151 (quoting *Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88). The prosecutor is not required to provide a race-neutral reason that is persuasive or even plausible. *See Fletcher,* 348 N.C. at 313, 500 S.E.2d at 680. The issue at this stage is the facial validity of the prosecutor's explanation; and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *See State v. Barnes,* 345 N.C. 184, 209-10, 481 S.E.2d 44, 57, *cert. denied,* 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied,* 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Our courts also permit the defendant to introduce evidence at this point that the State's explanations are merely a pretext. *See Gaines,* 345 N.C. at 668, 483 S.E.2d at 408.

Third, and finally, the trial court must make the ultimate determination as to whether the defendant has carried his burden of proving purposeful discrimination. *See Hernandez,* 500 U.S. at 359, 114 L. Ed. 2d at 405; *Fletcher,* 348 N.C. at 313, 500 S.E.2d at 680. As this determination is essentially a question of fact, the trial court's decision of whether the prosecutor had a discriminatory intent is to be given great deference and will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous. *See Fletcher,* 348 N.C. at 313, 500 S.E.2d at 680; *Kandies,* 342 N.C. at 434-35, 467 S.E.2d at 75. " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *State v. Thomas,* 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985)).

In the cases since *Batson* addressing the issue of peremptory challenges, this Court has described the factors relevant to determining whether a defendant established a *prima facie* showing of purposeful discrimination. Among the relevant factors are "[t]he race of the defendant, the victims, and the key witnesses." *Porter,* 326 N.C. at 498, 391 S.E.2d at 150-51. This Court has also considered "questions and statements made by the prosecutor during voir dire . . . and in exercising his peremptor[y] [challenges] which may either lend support to or refute an inference of discrimination." *State v. Robbins,* 319 N.C. 465, 489, 356 S.E.2d 279, 293, *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Another consideration is whether the prosecu-

tor engaged in a pattern of strikes or used a disproportionate number of peremptory challenges to strike jurors of a particular race. *See State v. Smith,* 328 N.C. 99, 121, 400 S.E.2d 712, 724 (1991); *Robbins,* 319 N.C. at 490-91, 356 S.E.2d at 294. "[O]ne factor tending to refute an allegation of discriminatory use of peremptor[y] [challenges] is the acceptance rate of black jurors by the State." *Smith,* 328 N.C. at 121, 400 S.E.2d at 724. This Court has previously emphasized that the frequency with which a prosecutor accepts black jurors is relevant to the issue of whether he is purposefully discriminating against blacks. *See State v. Allen,* 323 N.C. 208, 219, 372 S.E.2d 855, 862 (1988) (minority acceptance rate of 41% failed to establish *prima facie* case of purposeful discrimination), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); *State v. Abbott,* 320 N.C. 475, 481, 358 S.E.2d 365, 369-70 (1987) (acceptance rate of 40% failed to establish *prima facie* case).

Defendant contends that the trial court erroneously concluded its analysis upon finding that defendant failed to establish a *prima facie* showing of purposeful discrimination in the prosecutor's use of seven consecutive peremptory challenges to strike seven black prospective jurors. Defendant argues that the trial court should have required the prosecutor to state his reasons for challenging prospective jurors Alice Leonard, Alexis Whitaker, Kevin Wiggins, Sherman Daniel, Geraldine Kinney, Marjorie Whitaker, and Johnny Wills. Defendant further argues that the trial court erroneously focused on the racial composition of the jurors already selected and of the entire jury pool in determining that defendant had not established a *prima facie* showing of discrimination.

In this case, the prosecutor objected to defendant's exercise of a peremptory challenge removing white prospective juror West Jenkins. The prosecutor argued that six of the nine peremptory challenges exercised by defendant at that point were used to remove white male prospective jurors, thereby establishing a pattern of purposeful racial discrimination. In response to the prosecutor's challenge, defendant asked the trial court, in ruling whether the prosecutor had established a *prima facie* case of purposeful discrimination, to consider the prosecutor's use of six consecutive peremptory challenges to remove black prospective jurors Leonard, Whitaker, Wiggins, Daniel, Kinney, and Whitaker. The trial court denied the prosecutor's challenge without ruling whether the prosecutor had made a *prima facie* showing of discrimination.

STATE v. BRAXTON

[352 N.C. 158 (2000)]

Jury selection proceeded until the prosecutor attempted to exercise a peremptory challenge to remove black prospective juror Wills. Defendant argued that the prosecutor's exercise of seven consecutive peremptory challenges against black prospective jurors established purposeful racial discrimination by the prosecutor. The trial court heard arguments regarding the prosecutor's reverse-*Batson* challenge and defendant's *Batson* challenge. The trial court then reviewed the factors enunciated by this Court as relevant in determining whether a party has established a *prima facie* showing of purposeful discrimination.

The trial court ultimately concluded that, according to the jury questionnaires, the pool of prospective jurors was composed of 53% black jurors, 42% white jurors, and 5% American Indian jurors. At that time, the State had passed eight black prospective jurors and nine white prospective jurors to defendant. Five of the eight jurors already seated on the jury were African-American, resulting in a jury composed of 63% minority jurors. After noting that the racial composition of the jury at that point closely matched the racial composition of the entire jury pool, the trial court expressed its concern that the racial composition of the jury would become skewed if the prosecutor and defendant continued to strike jurors according to the peremptory patterns that had evolved during jury selection. The trial court then ruled that all further peremptory challenges must be made outside the presence of the individual juror and that the challenging party must articulate race-neutral reasons for removing that juror. Thereafter, defendant did not make another *Batson* challenge, and the final composition of the jury panel was eight black jurors and four white jurors. Three alternates were selected, one of whom was black and two of whom were white.

Assuming *arguendo*, as defendant contends, that the trial court failed to find a *prima facie* case, we conclude based on the record that the trial court carefully applied the correct criteria. We further conclude that, in light of the prosecutor's minority acceptance rate of 47%, the trial court did not err in finding that defendant failed to establish a *prima facie* showing of purposeful discrimination at that point in the jury selection process.

## GUILT-INNOCENCE PHASE

[8] In his next assignment of error, defendant contends that the trial court erroneously admitted into evidence at trial hearsay statements attributed to the victim. At trial, the victim's mother and grandmother

testified over defendant's objection that the victim had been placed "on lock-up" at Caledonia as a result of a back injury that prevented him from working. The trial court allowed the testimony after explicitly acknowledging that the statements constituted hearsay. Defendant argues that he was prejudiced by this inadmissible hearsay in that the trial court instructed the jury to consider the victim's physical strength in deciding whether defendant killed the victim in self-defense. We disagree.

Assuming *arguendo* that the victim's statements about his lockup status were inadmissible hearsay, any error in admitting them did not prejudice defendant. In addition to the testimony from the victim's mother and grandmother that the victim could not work due to a back injury, the prosecutor also elicited testimony from Officer Donald Gentry on direct examination that the victim had been placed on lockup for disrespecting an officer. On cross-examination, Sergeant Michael Johnson testified that the victim was on lockup for "not going to work." Thus, both the prosecutor and defendant presented evidence to the jury regarding the actual reasons for the victim's lockup status. Defendant was not precluded from presenting additional evidence regarding the victim's status or from rebutting prosecutorial evidence of the victim's peaceful character. In light of the overwhelming evidence of defendant's guilt, defendant cannot show that there is a reasonable possibility that the outcome of his trial would have been different if the trial court had excluded the testimony at issue. *See* N.C.G.S. § 15A-1443(a) (1999); *State v. Locklear*, 349 N.C. 118, 149, 505 S.E.2d 277, 295 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 559 (1999).

**[9]** Defendant also contends that the trial court's erroneous admission of the victim's hearsay statements was compounded by its error in excluding testimony that the victim was on lockup for profanity and disrespect. The trial court limited prosecution witness Officer Gentry's testimony on cross-examination as follows:

Q. Other than the tag or flag that was on the control switch for [the victim's] individual cell, did you have any personal knowledge or report knowledge of why he was on lock-up?

A. No.

Q. And you don't know when he went into that status?

A. No, sir.

Q. Do you know whether or not that he was subject to that process was to terminate on the 18th day of August, 1996?

A. No, I wouldn't know anything of that nature.

Q. What is the average approximate time of someone being on individual lock-up for profane language or disobeying an order?

A. The average time for what?

Q. Average time that person would be kept on lock-up.

A. I do not know that.

Q. Period of punishment is what I'm talking about.

A. I wouldn't know the average time for that.

. . . .

Q. Were you aware that [the victim] was put on lock-up on July 31, 1996, for profane language and disrespect?

[PROSECUTOR]: Objection

THE COURT: Sustained and don't—

[PROSECUTOR]: I'd ask for an instruction to counsel.

THE COURT: And don't consider counsel's question. Next question.

Defendant did not make an offer of proof to show what the witness' response to the question would have been. Accordingly, defendant has failed to preserve this issue for appellate review under the standard set forth in N.C.G.S. § 8C-1, Rule 103(a)(2). *See Atkins,* 349 N.C. at 79, 505 S.E.2d at 108. The substance of the excluded testimony was not necessarily apparent from the context within which the question was asked; therefore, an offer of proof was necessary to preserve this issue for appeal. *See id.; State v. Geddie,* 345 N.C. 73, 96, 478 S.E.2d 146, 157 (1996), *cert. denied,* 522 U.S. 825, 139 L. Ed. 2d 43 (1997). Officer Gentry had already testified on cross-examination that he did not know when the victim was placed on lockup. Further, Officer Gentry had testified during direct examination that the victim was put on lockup status for disrespecting an officer. Nothing in the record on appeal suggests that the victim was also being punished for the additional infraction of "profane language." The witness may well have answered that he was not aware of the facts contained in counsel's question. Thus, an attempt by this Court to presume the sub-

stance or prejudicial effect of Officer Gentry's excluded testimony would be speculation.

[10] Next, defendant contends that the trial court violated his constitutional right to a fair and impartial jury by allowing Bailiff Overton to participate in a courtroom demonstration in the role of the murder victim. During trial, prosecution witness Officer Roy Brown described the manner in which he searched the victim for contraband before escorting the victim into the shower on the day of the murder. Bailiff Overton acted as the victim, over defendant's objection, during Officer Brown's demonstration of the search. The trial court gave a limiting instruction that the jury should consider the demonstration "for illustration only."

This Court has consistently held that "where a witness for the State acts as custodian or officer in charge of the jury in a criminal trial, prejudice is conclusively presumed, and the defendant must have a new trial." *State v. Jeune*, 332 N.C. 424, 431, 420 S.E.2d 406, 410 (1992). To determine whether the witness acted as the officer in charge of the jury, this Court "look[s] to factual indicia of custody and control and not solely to the lawful authority to exercise such custody or control." *State v. Mettrick*, 305 N.C. 383, 386, 289 S.E.2d 354, 356 (1982).

In this case, defendant asserts that Bailiff Overton had "constant contact" with the jury and presumes that Bailiff Overton was the sworn officer in charge of the jury. However, defendant cites no evidence in the transcript or record that supports these assertions and thus offers no basis on which this Court could determine that Bailiff Overton was, in fact, the custodian of the jury. Mere presence in the courtroom is not sufficient. *See Jeune*, 332 N.C. at 432-33, 420 S.E.2d at 411. Additionally, Bailiff Overton was not called to testify as a witness; and he did not convey any communication to the jury through his participation in the courtroom demonstration. Therefore, we conclude that defendant is not entitled to a presumption of prejudice as a result of Bailiff Overton's conduct. *See, e.g., State v. Brown*, 315 N.C. 40, 57, 337 S.E.2d 808, 822 (1985) (declining to presume prejudice where the officer in charge of the jury seated himself behind the prosecutor and was never called to testify as a witness), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The likelihood that the outcome of the trial would have been different had Bailiff Overton not participated in the demonstration is *de minimus.*

Accordingly, any constitutional error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b). This assignment of error is overruled.

[11] In two separate arguments, defendant contends that the trial court erred by admitting impermissible opinion evidence. First, without objection from defendant, Officer Brown testified during direct examination that, at the time of the murder, he heard "shrill screaming" that sounded "like somebody is fearing for their life." Second, Officer Brown testified on direct examination over defendant's objection that the crime scene was worse than any hog killing he had ever seen. Third, Officer Alonzo Clark testified during direct examination over defendant's objection that he searched defendant because defendant "looked guilty" as he came out of the shower area holding his hands in the air. Finally, State witnesses Captain Grady Massey and Assistant Superintendent J.C. Wilson repeatedly testified over defendant's objection that defendant appeared calm and relaxed immediately following the murder, as though he had no problems or as if nothing unusual had happened. Further, Captain Massey testified at one point that defendant showed no remorse for killing the victim. Defendant argues that this testimony was unfairly prejudicial, speculative, and beyond the lay opinion permitted by N.C.G.S. § 8C-1, Rule 701.

Relevant evidence is generally admissible, *see* N.C.G.S. § 8C-1, Rule 402 (1999), except where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," N.C.G.S. § 8C-1, Rule 403 (1999). "Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992); *see also State v. Elliott*, 344 N.C. 242, 272, 475 S.E.2d 202, 215 (1996), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). We conclude that the trial court did not abuse its discretion by permitting Officer Brown, Officer Clark, Captain Massey, and Assistant Superintendent Wilson to testify about the victim's screams during the murder, the appearance of the crime scene, and defendant's behavior and demeanor immediately following the murder. This testimony was relevant to negate defendant's claim of self-defense as well as to establish his state of mind and intent to kill.

[12] Having concluded that the testimony was not unfairly prejudicial to defendant, we next consider whether Officer Clark's and

Officer Brown's testimony amounted to improper lay opinion. N.C.G.S. § 8C-1, Rule 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1999); *accord State v. Williams*, 319 N.C. 73, 78, 352 S.E.2d 428, 432 (1987). This rule permits evidence which can be characterized as a "shorthand statement of fact."

> This Court has long held that a witness may state the "instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." Such statements are usually referred to as shorthand statements of facts.

*State v. Spaulding*, 288 N.C. 397, 411, 219 S.E.2d 178, 187 (1975) (quoting *State v. Skeen*, 182 N.C. 844, 845-46, 109 S.E. 71, 72 (1921)), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976); *accord State v. Johnston*, 344 N.C. 596, 609, 476 S.E.2d 289, 296 (1996); *Williams*, 319 N.C. at 78, 352 S.E.2d at 432. Officer Brown's testimony that the victim's screaming sounded like somebody fearing for his life and that the crime scene was worse than a hog killing represented instantaneous conclusions based on his observation of a variety of facts. Similarly, Officer Clark's testimony that defendant looked guilty was based on his observation that, as defendant saw Officer Clark approaching, defendant immediately raised his hands. Finally, Captain Massey's and Assistant Superintendent Wilson's testimony that defendant appeared calm, relaxed, and without remorse represented instantaneous conclusions based on their observations of defendant's demeanor following the murder. Thus, we conclude that the testimony of these witnesses may be characterized as admissible shorthand statements of fact. The trial court did not err in admitting this testimony of these witnesses, and defendant's due process right to a fair trial was not violated. These assignments of error are overruled.

[13] In two other separate arguments defendant contends that the trial court erred in excluding testimony from defendant and from two other witnesses regarding the general availability of weapons at

Caledonia. Defendant argues that the excluded evidence was relevant to his claim of self-defense in that the testimony supported the reasonableness of his belief that he was about to be injured or killed. Defendant further contends that the trial court's erroneous rulings violated his constitutional right to due process and resulted in a death sentence imposed in violation of the Eighth Amendment to the United States Constitution. We disagree.

Where a defendant claims that he killed the victim in self-defense, "a jury should, as far as is possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life." *State v. Johnson*, 270 N.C. 215, 219, 154 S.E.2d 48, 52 (1967). In *State v. Spaulding*, 298 N.C. 149, 159, 257 S.E.2d 391, 397 (1979), this Court held that a defendant charged with committing a murder in prison "should be permitted to present to the jury his evidence of the availability of weapons both to rebut the state's evidence and to assist in establishing his claim of self-defense."

In this case, the trial court first excluded testimony from State witness Officer Brown, who testified on direct examination that he searched the shower area and the victim immediately prior to the time of the murder. The trial court permitted defendant to cross-examine Officer Brown about the security of the shower area and the adjoining sally port and about the possibility that another inmate could have reached into the shower and given the victim a knife. However, the trial court excluded any further cross-examination regarding searches of or weapons found in the victim's cell block. We conclude that the trial court properly excluded Officer Brown's testimony.

Under N.C.G.S. § 8C-1, Rule 611(a), the trial court properly exercised its discretion "to control the examination of witnesses, both for the purpose of conserving the trial court's time and for the purpose of protecting the witness from prolonged, needless, or abusive examination." *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 861, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995). Officer Brown had already testified that he did not know how frequently the victim's cell block was searched and that he could not recall whether he or any other officers had ever found knives during a search of the victim's cell block. Thus, this witness could not provide any further testimony regarding the general availability of weapons in the victim's cell block; and any further questioning of Officer Brown on this subject

would have been futile. Additionally, although the trial court excluded further cross-examination of Officer Brown, the trial court expressly stated that defendant could present other evidence that tended to establish the availability of weapons in the prison. Thus, consistent with *Spaulding*, 298 N.C. at 159, 257 S.E.2d at 397, defendant was not precluded from presenting such evidence and did in fact present such evidence.

Second, the trial court excluded defendant's response to a question during direct examination regarding his knowledge of the availability of knives at Caledonia. The trial court sustained the prosecutor's objection on the basis that defendant had already testified about the availability of knives and the dangerousness of the inmates at Caledonia. We conclude that the trial court properly exercised its discretion under N.C.G.S. § 8C-1, Rule 611(a) in sustaining the prosecutor's objection. Defendant had already testified extensively regarding frequent violence among the inmates and that "everybody at Caledonia, everybody has a knife." Defendant also testified that, during a cell-block search following a violent incident, officers discovered knives in twenty of the twenty-four cells in his and the victim's cell block. Therefore, any further testimony from defendant regarding the availability of knives would have been duplicative of defendant's earlier testimony.

Finally, the trial court excluded testimony from defense witness Marvin Sparrow, a former North Carolina Prisoner Legal Services attorney, regarding the dangerousness of the prisoners at Caledonia. The trial court ruled that Sparrow was not qualified to testify to prison conditions at the time of the murder. In *Spaulding*, 298 N.C. at 159-60, 257 S.E.2d at 397-98, this Court held competent and admissible the testimony of Lee Bounds, former Director of Prisons, about prevailing prison conditions. The Court based its conclusion on Bounds' "extensive experience" in North Carolina's prisons and his knowledge of the prison conditions at the time of the murder. *Id.* at 159, 257 S.E.2d at 397. In contrast, Sparrow based his opinion exclusively on prisoner complaints and on visits to Caledonia for the purpose of interviewing prisoners. Further, Sparrow last visited Caledonia in the summer of 1995 approximately one year prior to this murder which occurred in August 1996. Therefore, we conclude that Sparrow was in no better position than the jury to give his opinion about the prevailing conditions in Caledonia at the time of the murder; and the trial court did not abuse its discretion in excluding Sparrow's testimony. These assignments of error are without merit.

**[14]** Next, defendant contends that the trial court erred in allowing testimony from several inmates that defendant went to the shower area intending to kill the victim over money that the victim allegedly owed to defendant. Defendant argues that the statements were hearsay not falling within any hearsay exception. He further argues that any probative value of these statements was outweighed by the danger of unfair prejudice to defendant. We reject defendant's arguments for the following reasons.

Inmates Ronnie Sawyer and Michael Thomason testified that another inmate, Ronald Moore, told defendant "that guy" was in the shower and that defendant then walked toward the shower area. Both Sawyer and Thomason also testified that, shortly thereafter, defendant stabbed the victim to death in the shower.

Thomason additionally testified that another inmate asked defendant as he was being taken from the cell block after the murder why he killed the victim. Thomason gave further testimony that he had talked with the victim before the murder about the $17.00 that the victim owed to defendant.

Inmate Thomas McCombs testified that, after the victim went into the shower area, Moore told McCombs that he was going to approach defendant about straightening out the alleged debt owed by the victim.

Defendant argues that these statements constituted inadmissible and prejudicial hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard*, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984).

Rule 803(3) of the North Carolina Rules of Evidence provides that a statement by a declarant as to the declarant's then-existing state of mind is not excludable under the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1999). In interpreting Rule 803(3), this Court has held that the rule allows the admission of a hearsay statement of a then-existing intent to engage in a future act. *See State v. Sneed*, 327 N.C. 266, 271, 393 S.E.2d 531, 534 (1990); *State v. McElrath*, 322 N.C. 1, 17-18, 366 S.E.2d 442, 451 (1988). Therefore, Moore's statement to McCombs

that he was going to approach defendant about straightening out the victim's debt was admissible as evidence of Moore's then-existing intent to engage in a future act.

[15] The trial court properly excluded as impermissible hearsay Thomason's testimony that an anonymous inmate asked defendant why he killed the victim. Although the trial court initially overruled defendant's objection to this testimony, following an immediate *voir dire* of the witness and arguments by both parties, the trial court ruled that Thomason could testify that an inmate asked a question but could not testify as to what the inmate actually asked or how defendant responded. Thus, the trial court's initial error in overruling defendant's objection was subsequently corrected; and the inadmissible hearsay testimony was properly excluded.

[16],[17] With regard to the remaining testimony of which defendant complains, the trial court properly ruled that the statements did not constitute impermissible hearsay. Moore's statement to defendant shortly before the murder about "that guy" being in the shower was not offered to prove the truth of any matter asserted therein. Instead, the statement was offered to explain the subsequent conduct of defendant in walking toward the shower area. *See State v. Morston*, 336 N.C. 381, 399, 445 S.E.2d 1, 11 (1994). Thus, the statement was not hearsay and was properly admitted into evidence. Likewise, Thomason's testimony about the victim's $17.00 debt owed to defendant did not constitute hearsay. Thomason did not testify to any statements made by the victim. Rather, Thomason testified that he was aware of the debt and that he had talked with the victim about the debt. Therefore, this testimony was relevant to establish a possible motive for the murder and was properly admitted into evidence. Further, in light of the overwhelming evidence of defendant's guilt, none of the statements admitted into evidence were unfairly prejudicial to defendant. These assignments of error are without merit.

[18] In his next assignment of error, defendant contends that the trial court erred by excluding relevant evidence on the basis that the statements constituted unreliable and inadmissible hearsay. The trial court excluded defendant's proffered testimony that inmate Mack Cheatam told defendant that he had given a knife to the victim. The trial court also excluded inmate Ronald Moore's testimony that Cheatam told Moore that he had given a knife to the victim. Defendant argues that these statements did not constitute hearsay in that the statements were offered to show his state of mind and in

support of his self-defense claim, not to prove the truth of the matters asserted therein.

Although the excluded statements were properly admissible as corroborative of defendant's self-defense claim, this Court has held that "[t]here is no right to corroboration in advance" of the testimony of a witness. *State v. Hinson*, 310 N.C. 245, 256, 311 S.E.2d 256, 264, *cert. denied*, 469 U.S. 839, 83 L. Ed. 2d 78 (1984). In this case, after defendant testified that he believed the victim had a knife at the time of the murder and that he killed the victim in self-defense, the trial court properly allowed defendant to introduce other corroborative evidence that the victim possessed a knife. As noted earlier, defendant testified extensively about the availability of weapons and the frequency of prisoner violence in Caledonia. Additionally, both defendant and Moore testified about their conversation in which Moore told defendant that Cheatam had given the victim a knife. Thus, defendant was not precluded from presenting evidence that corroborated his self-defense claim; and defendant cannot show that he suffered any prejudice from the trial court's initial exclusion of the corroborative evidence. *See* N.C.G.S. § 15A-1443(a); *see also State v. Ball*, 324 N.C. 233, 237-38, 377 S.E.2d 70, 73 (1989) (holding that the defendant was not prejudiced by the order in which he was required to present corroborative evidence).

**[19]** Next, defendant contends in two separate arguments that the trial court should not have allowed the prosecutor to cross-examine defendant and inmate Moore about the details of their prior convictions and prison infractions. Defendant argues that the prosecutor's questions concerning prior convictions exceeded the scope of proper inquiry under N.C.G.S. § 8C-1, Rule 609(a) as interpreted by this Court in *State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993). Defendant further argues that the prosecutor's questions regarding prison infractions were unfairly prejudicial and exceeded the scope of permissible impeachment under N.C.G.S. § 8C-1, Rule 608(b).

The prosecutor asked defendant the following questions about his prior convictions: (i) whether defendant had "placed a belt around this officer's neck at Polk Youth Center while other inmates beat him"; (ii) whether defendant was transferred from Polk Youth Center "before or after you strangled [the officer]"; (iii) what kind of weapon defendant used, the name of the victim, and how much money defendant stole during the commission of an armed robbery; (iv) whether defendant had committed any other murders; and (v) whether defendant had committed the other murders "in sequence."

**STATE v. BRAXTON**

[352 N.C. 158 (2000)]

Evidence of a witness' prior convictions is admissible for the purpose of impeaching the witness' credibility. *See* N.C.G.S. § 8C-1, Rule 609(a) (1999). This Court held in *Lynch*, 334 N.C. at 410, 432 S.E.2d at 353, that a cross-examiner can elicit only "the name of the crime and the time, place, and punishment for impeachment purposes under Rule 609(a) in the guilt-innocence phase of a criminal trial." The Court further noted, however, that evidence which would otherwise be inadmissible may be permissible on cross-examination "to correct inaccuracies or misleading omissions in the defendant's testimony or to dispel favorable inferences arising therefrom." *Id.* at 412, 432 S.E.2d at 354. In this case defendant testified on direct examination that he had been convicted of two counts of first-degree murder, four counts of robbery with a dangerous weapon, second-degree kidnapping, larceny of a motor vehicle, assault with a deadly weapon, and numerous misdemeanors such as "traffic offenses, stuff like simple assault, misdemeanor breaking and entering." Defendant indicated he could not recall all the misdemeanor offenses. Thereafter, defendant characterized the attack on the officer at Polk Youth Center as "[getting] into some trouble." Further, in describing the dangerousness of the prisoners at Caledonia, defendant used serial killers as an example of dangerous inmates that might reside in defendant's cell block.

On cross-examination the prosecutor questioned defendant about the misdemeanors and in an effort to jog defendant's memory, mentioned factual details. The prosecutor also asked if the assault on the officer at Polk Youth Center was what defendant meant by "getting into trouble" and whether this was the incident that caused defendant to be transferred from Polk Youth Center to Blanch, a more restrictive facility which defendant had described on direct examination. In response to a question by the prosecutor concerning when he started the cycle of being continuously in and out of prison, defendant volunteered information about stealing a car; and the prosecutor then asked him who the victim was and if he was charged with stealing a car. Defendant responded that he stole a cab and that he was charged with larceny of a motor vehicle and robbery. The prosecutor asked what kind of robbery it was in order to clarify that it was armed robbery and then asked what type of weapon defendant used. The prosecutor also cross-examined defendant about the sequence and timing of the other murders that defendant had committed.

Considering defendant's testimony on direct examination which tended to minimize the seriousness of his criminal involvement, we conclude the prosecutor did not exceed the scope of proper exami-

nation. The prosecutor did not improperly ask defendant about "tangential circumstances of the crime[s]." *State v. King*, 343 N.C. 29, 49, 468 S.E.2d 232, 245 (1996). The questioning "related to the factual elements of the crime[s]" and to necessary detail intended to jog defendant's memory. *Id.*

[20] Similarly, on direct examination Moore testified that he had been convicted of assault and two robberies. On cross-examination Moore again testified that he had been convicted of two robberies; and in response to the prosecutor's question asking what kind of robberies, Moore stated "stick-ups." Moore then admitted the robberies were armed robberies, and the prosecutor asked Moore what type of weapon he had used to commit each offense. Moore then admitted that he was convicted of assault with a deadly weapon inflicting serious injury; the prosecutor asked Moore what weapon he used, and Moore indicated a gun. We conclude that the prosecutor's questions related to the factual elements of the crime rather than the tangential circumstances of the crime. We held in *Lynch*, 334 N.C. at 410, 432 S.E.2d at 353, that similar questions by the prosecutor exceeded the permissible scope of impeachment under Rule 609(a). However, the prosecutor in that case not only asked the defendant about the weapons used to commit each crime but also cross-examined the defendant "about his living arrangements with [the shooting victim], words he spoke to her when he entered her home, his confusion about the circumstances, his confusion about whether he pled guilty . . . , and the fact that he was in a blackout at the time." *Id.* at 408, 432 S.E.2d at 352. Moreover, unlike the defendant in *Lynch*, Moore was not completely forthright and accurate in testifying about his prior convictions on direct examination. *See id.* at 412-13, 432 S.E.2d at 354. The prosecutor here asked only about weapons, not about other circumstances of the crimes, and thereby clarified the nature of the crimes which Moore had tended to minimize. Thus, the prosecutor's questions were within the scope of proper impeachment. Even if the questions in this instance did exceed the proper scope of inquiry, any error was not prejudicial in that the questions were asked of a defense witness, not of defendant. *See King*, 343 N.C. at 50, 468 S.E.2d at 245. Further, in light of the overwhelming evidence of defendant's guilt, no reasonable possibility exists that a different result would have been reached at trial absent the alleged error. *See* N.C.G.S. § 15A-1443(a); *King*, 343 N.C. at 50, 468 S.E.2d at 245.

[21] Defendant additionally argues that the trial court erred by allowing the prosecutor to cross-examine defendant and Moore with

respect to their prison infractions. Defendant argues that the prosecutor's questions related to specific instances of conduct which were not probative of truthfulness and that the inquiry violated N.C.G.S. § 8C-1, Rule 608(b). Defendant also argues that the evidence of defendant's and Moore's prison infractions was unfairly prejudicial in that the prosecutor portrayed both witnesses as violent and not credible.

Rule 608(b) provides that specific instances of conduct of a witness may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness." N.C.G.S. § 8C-1, Rule 608(b) (1999).

> Rule 608(b) of the North Carolina Rules of Evidence governs the admissibility of specific acts of misconduct where (i) the purpose of the inquiry is to show conduct indicative of the actor's character for truthfulness or untruthfulness; (ii) the conduct in question is in fact probative of truthfulness or untruthfulness; (iii) the conduct in question is not too remote in time; (iv) the conduct did not result in a conviction; and (v) the inquiry takes place during cross-examination. *See State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 89-90 (1986). "Among the types of conduct most widely accepted as falling into this category are 'use of false identity, making false statements on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Id.* at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979)).

*State v. Bell*, 338 N.C. 363, 382, 450 S.E.2d 710, 720 (1994), *cert. denied*, 515 U.S. 1163, 132 L. Ed. 2d 861 (1995).

Defendant argues that the prosecutor exceeded the scope of Rule 608(b) by eliciting from defendant on cross-examination information about the following prison infractions: (i) placed on lockup on 4 January 1994 for weapon possession; (ii) disciplined on 10 November 1993 for provoking an assault; (iii) disciplined on 26 May 1996 for disobeying an order and fighting; (iv) disciplined on 3 July 1996 for profane language, disobeying an order, and making a verbal threat; and (v) disciplined on 6 August 1996 for weapon possession. Defendant contends that these prison infractions do not inherently involve dishonesty and that nothing in the context of the challenged questions suggested that defendant's prison infractions were probative of his

truthfulness or untruthfulness. The transcript discloses that the prosecutor's questions were directed at testimony given by defendant on direct examination that was indicative of defendant's character for untruthfulness. Defendant testified on direct examination about the living conditions that he endured while on lockup and while on maximum security but never explained why he was confined in this manner. However, the prosecutor's questions about the 4 January 1994 incident revealed that defendant was not mistreated by the prison system but, in fact, was placed on lockup as punishment for his misconduct. Therefore, we conclude that the purpose of the prosecutor's inquiry was to show defendant's character for untruthfulness and that the trial court did not abuse its discretion under Rule 608(b) by allowing the inquiry.

Further, we cannot say that the probative value of the 4 January 1994 incident was "substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). Most evidence tends to prejudice the party against whom it is offered. However, "to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed." *State v. Lyons*, 340 N.C. 646, 669, 459 S.E.2d 770, 783 (1995). In light of defendant's extensive testimony on direct examination regarding the amount of time that defendant was confined to lockup at various institutions throughout the prison system, we conclude that the probative value of defendant's 4 January 1994 prison infraction was not substantially outweighed by the dangers of unfair prejudice.

In regard to defendant's other prison infractions, we note that defendant failed to object to the prosecutor's questions. Therefore, defendant may not raise the issue on appeal. N.C. R. App. P. 10(b)(1); *State v. Call*, 349 N.C. 382, 414-15, 508 S.E.2d 496, 516 (1998). By failing to properly preserve this issue, defendant is entitled to review only for plain error. However, defendant fails to argue plain error with respect to his remaining prison infractions, thereby waiving appellate review. *See* N.C. R. App. P. 10(c)(4); *Call*, 349 N.C. at 415, 508 S.E.2d at 516.

[22] Defendant also argues that the prosecutor exceeded the scope of Rule 608(b) by eliciting the following prison infractions from Moore on cross-examination: (i) placed on segregation for stabbing someone with a pen, (ii) disciplined for disobeying an order, (iii) disciplined on three separate occasions for fighting, and (iv) disciplined for provoking a fight. Defendant failed to object at any point to the

prosecutor's impeachment of Moore based on his prison infractions. Therefore, defendant is entitled to review only for plain error. *See* N.C. R. App. P. 10(c)(4); *Call*, 349 N.C. at 414-15, 508 S.E.2d at 516. Plain error exists where, after reviewing the entire record, the claimed error is so fundamental, so basic, so prejudicial, or so lacking in its elements that justice could not have been done. *See State v. Fleming*, 350 N.C. 109, 132, 512 S.E.2d 720, 736, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 274 (1999); *State v. Davis*, 349 N.C. 1, 29, 506 S.E.2d 455, 470 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

Assuming *arguendo* that the prosecutor's questions about Moore's prison infractions exceeded the permissible scope of impeachment under N.C.G.S. § 8C-1, Rule 608(b), we hold that admission of the evidence did not rise to the level of plain error. To prevail on plain error review, defendant must show that (i) a different result probably would have been reached but for the error or (ii) the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial. *See State v. Bishop*, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997). As defendant has failed to make the necessary showing, these assignments of error are overruled.

**[23]** In his next assignment of error, defendant contends that the trial court erred in not allowing defendant's expert witness to give his opinion as to defendant's state of mind at the time of the homicide. Defendant argues that the excluded testimony of Dr. Nathan Strahl tended to show that defendant was not in a cool state of mind and that defendant suffered from diminished capacity at the time of the killing. Thus, defendant argues that this evidence was relevant to show that defendant did not premeditate and deliberate the killing and to show the reasonableness of defendant's belief that he was in physical danger at the time of the killing.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). Any relevant evidence is generally admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. *See* N.C.G.S. § 8C-1, Rules 402, 403 (1999); *State v. Lawrence*, 352 N.C. at 17, —— S.E.2d at ——; *State v. Eason*, 328 N.C. 409, 421, 402 S.E.2d 809, 814 (1991). Expert testimony is admissible under N.C.G.S. § 8C-1, Rule 702, "if it will assist the 'trier of fact to understand the evidence or to determine a fact in issue.' " *State v.*

*Weeks,* 322 N.C. 152, 164, 367 S.E.2d 895, 903 (1988) (quoting N.C.G.S. § 8C-1, Rule 702 (1986)). In determining the admissibility of expert opinion, the test is "whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson,* 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978).

In the present case, defense counsel sought a ruling from the trial court on the admissibility of Dr. Strahl's opinion concerning the effect of long-term maximum-custody lockup at Caledonia on defendant's behavior. On *voir dire,* Dr. Strahl stated that he had an opinion as to the effect of long-term lockup and testified as follows:

> [Defendant] was incarcerated under a lock-up condition for a total of 21 months, partly at the Blanch and partly at Caledonia. And medically speaking in terms of mental health issues, long term lock-up produces a medical condition known as prison psychosis, which is a paranoid personality change that comes on a person who has been put in a reclusive secluded environment over a long period of time.

Dr. Strahl further explained that defendant "would have a hard time distinguishing between appropriate fears and inappropriate fears" and that defendant may overreact in nondangerous situations.

In *Spaulding,* 298 N.C. at 160, 257 S.E.2d at 398, this Court held that the trial court properly excluded expert testimony about the effect of imprisonment on the defendant on the basis that the expert was in no better position than the jury to determine the reasonableness of the defendant's apprehension. Similarly, in this case, we are not convinced that Dr. Strahl was in any better position than the jury to determine that, as the result of long-term imprisonment, certain legal standards had not been met, namely, that defendant did not premeditate and deliberate and that defendant was responding to a threat he genuinely perceived. Having the expert testify as requested by defendant would tend to confuse, rather than help, the jury in understanding the evidence and determining the facts in issue. *See Weeks,* 322 N.C. at 167, 367 S.E.2d at 904. Therefore, we conclude that the trial court did not err in refusing to admit this testimony.

[24] Next, defendant contends that the trial court erred in permitting the prosecutor to cross-examine defense expert Dr. Strahl after defendant attempted to withdraw Dr. Strahl as a witness. Defendant

STATE v. BRAXTON

[352 N.C. 158 (2000)]

further argues that the trial court permitted the prosecutor to mock and attack Dr. Strahl's credibility by characterizing Dr. Strahl's testimony as incomplete during closing arguments. Defendant contends that these errors deprived him of a fair trial and due process of law. We disagree.

Generally, when a witness, including a defense witness in a criminal trial, takes the stand and testifies, the opposing party has an absolute right to cross-examine the witness. *See State v. Burgin*, 313 N.C. 404, 406, 329 S.E.2d 653, 656 (1985). In this case, Dr. Strahl testified on direct examination regarding his qualifications as an expert witness. However, Dr. Strahl also gave the following substantive testimony:

I believe at Caledonia that the atmosphere of the prison system is very rigorous, very extensive, very demanding, and at times, overwhelming. Inmates live in a very difficult environment with a great deal of violence and a great deal of fear of violence.

And the reactivity to that is actually molded by the environment itself. That is, in my medical opinion, the facility of the prison actually molds the behavior of inmates who live within it.

Dr. Strahl further testified that he interviewed defendant at Caledonia on two separate occasions and that he had reviewed several reports and records concerning prison violence and prison searches at Caledonia. After the trial court sustained the prosecutor's objection to Dr. Strahl's testimony regarding defendant's alleged "prison psychosis," defense counsel attempted to withdraw Dr. Strahl as a witness. However, contrary to defendant's contentions, Dr. Strahl had already testified about matters other than his credentials as an expert witness. Therefore, we conclude that the trial court properly permitted the prosecutor to cross-examine Dr. Strahl. Further, after a thorough review of the transcript, we conclude that the prosecutor properly impeached Dr. Strahl's credibility without asking any questions or eliciting any testimony that related to the evidence excluded by the trial court.

[25] With respect to the prosecutor's closing argument, we conclude that the argument did not violate the scope of permissible prosecutorial conduct. During closing argument the prosecutor argued as follows:

> And the defendant's so-called expert, Nathan Strahl, M.D., PhD, the only thing of merit—well, I'll let you determine what he said, if he said anything of merit. But he comes in and he says prison molds people.

The prosecutor later argued:

> Nathan Strahl wants to tell us that prison molds inmates. Where's the rest of it, Dr. Strahl, M.D., PhD?

Preliminarily, we note that defendant in this case did not object to the prosecutor's closing argument. Where a defendant fails to object, an appellate court reviews the prosecutor's arguments to determine whether the argument was "so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error." *State v. Williams*, 317 N.C. 474, 482, 346 S.E.2d 405, 410 (1986). As we have stated previously, "only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996).

When viewed in context of the conflicting evidence concerning defendant's intent and state of mind at the time of the murder, we conclude that it was not a "gross impropriety" to argue that Dr. Strahl's testimony was incomplete. This Court has consistently held that " 'counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case.' " *State v. Allen*, 322 N.C. 176, 195, 367 S.E.2d 626, 636 (1988) (quoting *State v. Covington*, 290 N.C. 313, 327-28, 226 S.E.2d 629, 640 (1976)). Here, the prosecutor in his closing argument properly referred to Dr. Strahl's direct testimony that prison molds the behavior of inmates. Further, the prosecutor's comment, "[w]here's the rest of it, Dr. Strahl, M.D., PhD?" when taken in context, does not refer to Dr. Strahl's excluded testimony. Just before this rhetorical question, the prosecutor has commented on conditions at Caledonia and had suggested that it was a miracle more incidents did not occur with the six or seven hundred of the worst inmates. The prosecutor further noted that of all the infractions committed at Caledonia over the past several years, only one murder was committed. Thus, the prosecutor implied that, if prison

actually molds inmate behavior as Dr. Strahl testified, more prisoners, not just defendant, would have committed more serious offenses at Caledonia.

In light of Dr. Strahl's direct testimony that prison molds inmate behavior, we cannot conclude that the prosecutor's inference was so grossly improper as to require the trial court to intervene *ex mero motu* when, at trial, defense counsel apparently did not believe the argument was prejudicial. *See State v. Murillo*, 349 N.C. 573, 606, 509 S.E.2d 752, 771 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 87 (1999); *State v. Campbell*, 340 N.C. 612, 630, 460 S.E.2d 144, 153 (1995), *cert. denied*, 516 U.S. 1128, 133 L. Ed. 2d 871 (1996). This assignment of error is overruled.

[26] Next, defendant contends that the trial court erred by prohibiting counsel from informing the jury during closing arguments that the trial court had reversed its earlier ruling in which it refused to instruct on the lesser-included offenses of second-degree murder and voluntary manslaughter. Defendant further contends that the trial court erred by denying defendant's motion for a mistrial. We disagree.

During the charge conference, the trial court denied defendant's request for jury instructions on the lesser-included offenses of second-degree murder and voluntary manslaughter. After the prosecutor and defense counsel completed their initial arguments but prior to final closing arguments, the trial court reversed its earlier ruling and informed the parties that it would instruct the jury as requested by defendant. The trial court permitted both parties to reopen their initial arguments after strongly cautioning that neither party would be allowed to mention the trial court's ruling. The trial court then denied defendant's motion for a mistrial.

Although counsel is given wide latitude during closing arguments, "the conduct of arguments of counsel to the jury must necessarily be left largely to the sound discretion of the trial judge." *State v. Whiteside*, 325 N.C. 389, 398, 383 S.E.2d 911, 916 (1989). Further, "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1999).

We find nothing in the record to suggest that the trial court abused its discretion by reopening arguments and prohibiting mention of its ruling rather than declaring a mistrial. The trial court acted appropriately to ensure that its decision to instruct the jury on the

lesser-included offenses would not affect the proceedings or result in the appearance of partiality. Additionally, the trial court reversed its ruling in ample time for defendant to revise his closing argument in such a way as to avoid drawing attention to the disparities between the two arguments. Upon reviewing the transcript, we note that defense counsel transitioned smoothly from his first argument, in which he argued the elements of first-degree murder and self-defense, into his second argument, in which he reminded the jury of his first argument before continuing with the elements of second-degree murder and voluntary manslaughter. Finally, the trial court reversed its ruling and instructed the jury on lesser-included offenses according to defendant's request. Thus, defendant cannot show that he suffered any prejudice. *See* N.C.G.S. § 15A-1443(c). Having concluded that defendant was not prejudiced as the result of the trial court's rulings, we further conclude that the trial court properly denied defendant's motion for mistrial. *See* N.C.G.S. § 15A-1061 (1999). This assignment is without merit and is, therefore, overruled.

**[27]** In his next assignment of error, defendant contends that the trial court committed prejudicial constitutional error in failing to intervene *ex mero motu* at several points during the prosecution's closing argument. We disagree.

Where a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Davis*, 349 N.C. at 23, 506 S.E.2d at 467.

In this case, the prosecutor first argued to the jury as follows:

And then you move to the third element of what this cowardly bully has to have to come in here and hang his hat on a valid principle of law of self-defense, and it besmirches and degrades self-defense. It's spitting in the eye of the law. It's vomit.

It's vomit on the law of North Carolina for this man to try to use self-defense because he's got to show, in addition to the other two, that he was not the aggressor.

Defendant maintains that the prosecutor impermissibly expressed his personal opinion about the falsity of defendant's self-defense claim.

Under N.C.G.S. § 15A-1230, "[d]uring a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record." N.C.G.S. § 15A-1230(a) (1999). In *State v. Pittman*, 332 N.C. 244, 262, 420 S.E.2d 437, 447 (1992), this Court held that the prosecutor did not improperly assert his personal beliefs when he argued that "justice in Halifax County will be dead" if the defendant was found not guilty. Instead, we explained that "[t]his argument was a hyperbolic expression of the State's position that a not guilty verdict, in light of the evidence of guilt, would be an injustice." *Id.* Similarly, in this case, the prosecutor's assertion that defendant's self-defense claim is "vomit on the law of North Carolina" constitutes a permissible expression of the State's position that, in light of the overwhelming evidence of defendant's guilt, the jury's determination that defendant acted in self-defense would be an injustice. Therefore, we conclude that the prosecutor's statement was not so grossly improper as to require the trial court to intervene *ex mero motu.*

**[28]** Second, the prosecutor made the following argument to the jury:

A man was taking a shower when this thing came up in that shower and hacked him to death and turned him from this young man right here (indicating on photo) to this right here[] (indicating on photo)[.]

Defendant also contends that the prosecutor repeatedly referred to defendant as "cowardly." Defendant argues that the prosecutor's characterizations of defendant as "this thing" and as "cowardly" constitute abusive and impermissible references to defendant.

This Court has stated that it is improper to compare "criminal defendants to members of the animal kingdom." *Richardson*, 342 N.C. at 793, 467 S.E.2d at 697. However, in this instance the prosecutor never compared defendant to an animal. Instead, the prosecutor's comments regarding defendant's cowardice were connected to the evidence which suggested that the victim was physically smaller and weaker than defendant and that the victim was naked and defenseless at the time of the killing. In context the use of the word "cowardly" to describe defendant, while not complimentary, was not disparaging. *See State v. Warren*, 348 N.C. 80, 125-26, 499 S.E.2d 431, 457 (holding that the prosecutor's description of the defendant as a

"coward" was not disparaging in light of evidence that the defendant preyed on weak victims), *cert. denied,* 525 U.S. 915, 142 L. Ed. 2d 216 (1998).

Likewise, the prosecutor's one-time description of defendant as "that thing" was not so improper as to require action by the trial court *ex mero motu.* In *State v. Perkins,* 345 N.C. 254, 286, 481 S.E.2d 25, 40, *cert. denied,* 522 U.S. 837, 139 L. Ed. 2d 64 (1997), the prosecutor called the defendant "sorry" and said that "describ[ing] him as a man is an affront to all of us." We emphasized that the remarks were isolated in holding that the trial court properly overruled the defendant's objection to them. *See id.* at 287, 481 S.E.2d at 40. Further, this Court has previously held that a trial court did not commit reversible error by failing to intervene *ex mero motu* where the prosecutor's description of the defendant was more disparaging than the prosecutor's one reference to defendant as "that thing" in this case. *See, e.g., State v. Trull,* 349 N.C. 428, 454, 509 S.E.2d 178, 195 (1998) (referring to the defendant as a "predator"), *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 80 (1999); *State v. Reeves,* 337 N.C. 700, 733, 448 S.E.2d 802, 817 (1994) (describing the defendant as a "predator"), *cert. denied,* 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *State v. Hamlet,* 312 N.C. 162, 173, 321 S.E.2d 837, 845 (1984) (describing the defendant as an "animal" and referring to his environment as a "jungle"). Therefore, we conclude that the prosecutor's statements were not so grossly improper as to require the trial court to intervene *ex mero motu.*

**[29]** Finally, the prosecutor argued to the jury as follows:

And in this case I speak for the State. I can't run from that duty. I can't give it over to anybody else. I speak for the State.

I also sit on the tombstone of [the victim], and I speak for [the victim] because he doesn't have the privilege of putting his hand on the Bible and coming in here and testifying himself.

Defendant contends that the prosecutor's argument blatantly urged the jury to return a death sentence on behalf of the victim.

This Court has previously found no gross impropriety requiring intervention *ex mero motu* when a prosecutor has argued that he speaks for the victim. *See Trull,* 349 N.C. at 454, 509 S.E.2d at 195; *Elliott,* 344 N.C. at 275, 475 S.E.2d at 217. Since the prosecutor's argument in this case merely reminded the jurors that he was advocating for both the State and the victim, we overrule this assignment of error.

[30] By his next assignment of error, defendant argues that the trial court erred in instructing the jury that a shank was a dangerous weapon as a matter of law in that the instruction created a conclusive presumption on an element of the offense and relieved the State of its burden of proof in violation of defendant's right to due process of law. This Court has previously rejected this argument in *State v. Torain*, 316 N.C. 111, 123, 340 S.E.2d 465, 472, *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986), and in *State v. DeCastro*, 342 N.C. 667, 700, 467 S.E.2d 653, 671, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996). As defendant failed to offer any new argument, we overrule this assignment of error.

## SENTENCING PROCEEDING

[31] Next, defendant contends that the trial court erred by allowing during the capital sentencing proceeding the improper testimony of Officer Malley Bissett concerning defendant's demeanor and alleged lack of remorse during a prior investigation. We disagree. Officer Bissett had investigated defendant's prior convictions for the murders of Emmanuel Oguayo and Donald Ray Bryant. Officer Bissett had been with defendant for approximately "five or six hours" during that investigation. The prosecutor in this case asked Officer Bissett the following question:

Q. During that time, did this defendant express any sorrow or any remorse for his crime?

A. Not really. At one point—the only—I recall that the only thing he said was I wish it hadn't happened, but that's the only—actually, no remorse, but he said he wished it hadn't happened.

Officer Bissett also testified that he never saw defendant shed a tear or become emotional.

Defendant did not object to the prosecutor's question at that time. Having failed to object, defendant is entitled to relief based on this assignment of error only if he can demonstrate plain error. "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

In capital sentencing proceedings, "[a]ny competent, relevant evidence which wil[l] substantially support the imposition of the death penalty may be introduced at this stage." *State v. Bond*, 345 N.C. 1, 31,

478 S.E.2d 163, 179 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). Regarding the admissibility of lay opinions, this Court recently stated:

> Although the Rules of Evidence do not apply in sentencing proceedings, they may be helpful as a guide to reliability and relevance. *See Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980). Under those rules, a lay witness may testify in the form of an opinion if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (1986). We have held that the mental condition of another is an appropriate subject for lay opinion. In *State v. Strickland*, 321 N.C. 31, 361 S.E.2d 882 (1987), we noted that " '[a] lay witness, from observation, may form an opinion as to one's mental condition and testify thereto before the jury.' " *Id.* at 38, 361 S.E.2d at 886 (quoting *State v. Moore*, 268 N.C. 124, 127, 150 S.E.2d 47, 49 (1966)).

*Bond*, 345 N.C. at 31, 478 S.E.2d at 179.

Officer Bissett's testimony is based on his personal observation of defendant during the investigation for a period of "five or six hours." Officer Bissett's opinion that defendant demonstrated no remorse for his previous crimes is competent, relevant evidence of defendant's mental condition. Further, Officer Bissett's testimony is favorable to defendant in that it is consistent with defendant's testimony regarding this murder that "I regret that all of this has ever happened." Therefore, we conclude that the trial court did not commit error, much less plain error, in allowing Officer Bissett's testimony of defendant's mental condition. This assignment of error is overruled.

[32] In three separate assignments of error, defendant next contends that the trial court erred by excluding potential mitigating evidence presented by his younger sister and mother. The testimony concerned his childhood difficulties, his caring relationship with his younger sister, and the psychological trauma caused by his biracial background. Defendant argues that the excluded testimony was essential to support corresponding nonstatutory mitigating circumstances. We disagree.

The trial court limited defendant's sister's testimony as follows:

Q. Can you describe the relationship that you had with your brother?

A. He was kind of like a fatherly figure, real—kind of a take-charge person. He looked out for me. We talked a lot. He, I guess you could say, schooled me on how boys were. You know, just trying to look out for me and make sure I did the right things and he still does.

. . . .

Q. You said he would talk to you?

A. Yes.

Q. Talk about things with you?

A. Yes.

Q. Would you give us an example and tell us what kind of things he would talk with you about?

[PROSECUTOR]: Well, objection as to relevance, Your Honor.

THE COURT: Sustained.

Q. In reference to the relationship that you say you had with him and the type of things that—you say he was a father figure—

A. Yes.

Q. —Can you explain to me the type things he would do concerning being a father figure to you?

A. Well, just the things that a father would do. If I felt bad or—you know, he would come and talk with me and tell me it's okay. He would look out for me and make sure I made the right decisions, do the right things.

Q. What effect, if any, if you know, did being biracial have upon [defendant]?

[PROSECUTOR]: Well, objection, as to what effect it had on [defendant].

THE COURT: Sustained.

Q. Were you around him when there were any racial incidents involving [defendant]?

A. Yes.

Q. Can you tell me some of the things that you heard that was said to him?

STATE v. BRAXTON

[352 N.C. 158 (2000)]

[PROSECUTOR]: Well, object.

THE COURT: Sustained.

Q. Did you see any of his reactions after you were around when there were incidents or racial incidents said to him?

A. Yes.

Q. Can you tell me how [defendant] reacted?

A. Well, we had a neighbor which would call us niggers or my mother a nigger-lover. And I mean, we all had thoughts about it, but, you know—my mom would usually say, well, don't worry about it; it's just ignorance of other people.

Defendant made no offer of proof to the witness' possible answers to the objectionable questions. Therefore, defendant has failed to preserve this issue for appellate review. See N.C.G.S. § 8C-1, Rule 103(a)(2) (1999); Atkins, 349 N.C. at 79, 505 S.E.2d at 108. However, defendant argues that the "significance of this evidence is obvious from the record" and that the excluded general information is "discernible from subsequent answers and the context of the questioning." This Court has allowed appellate review even in the absence of an offer of proof where "the 'essential content' of the excluded testimony and its significance are obvious." State v. Hester, 330 N.C. 547, 555, 411 S.E.2d 610, 615 (1992). Here, we conclude that the "essential content" and "significance" of the excluded testimony is not "obvious" since it is impossible to determine whether the excluded testimony would have been reliable and relevant.

Regarding the admissibility of evidence at capital sentencing proceedings, our capital sentencing statute provides in pertinent part:

Evidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (e) and (f). Any evidence which the court deems to have probative value may be received.

N.C.G.S. § 15A-2000(a)(3) (1999). The trial judge's authority to rule on the admissibility of evidence is not impaired by the language of this statute. See State v. Cherry, 298 N.C. 86, 98, 257 S.E.2d 551, 559 (1979), cert. denied, 446 U.S. 941, 64 L. Ed. 2d 796 (1980).

Assuming arguendo that this issue has been properly preserved, we conclude that the trial court did not abuse its discretion in exclud-

ing the testimony. Our review of the transcript reveals that the trial court did not prohibit defense counsel from asking defendant's sister about what defendant did for her as a father figure in her life and about her personal observations of defendant's reactions to biracial incidents during his childhood. The trial court properly sustained defense counsel's general question of "what kind of things [defendant] would talk with you about" on the ground of relevance. The trial court also properly prohibited defense counsel from asking defendant's sister what effect being biracial had on defendant since this question related to defendant's own personal thoughts and feelings of which his sister lacked personal knowledge and, in effect, would have elicited unreliable testimony.

[33] Defendant also argues that the trial court improperly restricted defense counsel's inquiry of his mother regarding his childhood psychological abuse and self-hatred as a result of being biracial. The trial court limited defendant's mother's testimony as follows:

Q. Did [defendant] ever display—during his formative years or younger years, did he ever display any feelings of self-hatred?

[PROSECUTOR]: Well, objection.

THE COURT: Well, sustained.

Q. What type of feelings, if any, as a young boy growing up did [defendant] display?

[PROSECUTOR]: Objection as to what feelings.

THE COURT: Well, it's awfully broad.

Outside the presence of the jury, the prosecutor objected to the witness being asked about defendant's feelings rather than her observations about defendant's behavior; and the trial court sustained the objection. After a rephrasing of the questions and a *voir dire* of the witness, the trial court allowed the testimony. Thereafter defendant's mother testified without objection about defendant's emotional conflict as a child as a result of being biracial. We conclude that the trial court did not abuse its discretion in restricting the testimony to the witness' personal observations of defendant's reactions and emotional state as a child. These assignments of error are overruled.

[34] Defendant next contends that the trial court erred in completely excluding the testimony of Dr. Claudia Coleman at the sentencing hearing. Defendant called Dr. Coleman to testify about defendant's

STATE v. BRAXTON

[352 N.C. 158 (2000)]

mental condition at the time of the offense. Defendant argues that the trial court acted under a misapprehension of the law, abused its discretion, and deprived defendant of his due process rights by excluding the testimony for defendant's failure to disclose Dr. Coleman's report to the prosecutor in advance of her testimony as required by the trial court's 14 October 1997 order. We disagree.

During jury selection the prosecutor requested that defendant furnish him with a written report of any expert witness in reciprocal discovery pursuant to N.C.G.S. § 15A-905. Defendant stated that he "[understood] his obligation to produce those reports to the State once a determination, once the report is prepared and once the determination has been made that these witnesses will be called." Later, during jury selection, the prosecutor again asked for the reports of defendant's mental health witnesses. After much discussion over proposed deadlines for disclosure, the trial court ruled that defendant must furnish such reports within five working days of the witness' testimony and told defense counsel to let it know if the deadline became "onerous."

On Wednesday, 19 November, the day after the State concluded its sentencing proceeding evidence, the prosecutor advised the trial court that he received a fax of Dr. Coleman's two-page psychological assessment after 5:00 p.m. the previous evening. Defense counsel informed the trial court that he had received a fax of Dr. Coleman's report the previous morning, Tuesday, 18 November, and that defendant had not decided to call Dr. Coleman as a witness until Monday, 17 November, after the guilty verdict. According to Dr. Coleman, the report was prepared in September and counsel had contacted her on 17 November to inform her that she would be needed as a witness and to request that the report be faxed to them. After hearing the *voir dire* testimony of Dr. Coleman, viewing the report, and hearing from opposing counsel, the trial court denied the testimony of Dr. Coleman based on its 14 October 1997 disclosure order, stating the following:

> I have reviewed her report. I've heard some of her—some of the things she has to say, but I've looked at her report. I see nothing that has basically not almost been touched on by other witnesses, and so I see no, so to speak, heroic, unusual, or out of the ordinary testimony that's not ordinary in these kind of matters, but even if they were, I believe it would be appropriate to do what I am now doing, and that is denying based on my earlier order testimony by this witness. Too late.

The pretrial discovery statute, in pertinent part, provides:

[T]he court must, upon motion of the State, order the defendant to permit the State to inspect and copy or photograph results or reports of physical or mental examinations . . . made in connection with the case . . . within the possession and control of the defendant *which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial,* when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1999) (emphasis added). Even after trial is underway, the trial court, "[t]o insure that truth is ascertained and justice served, . . . must have the power to compel the disclosure of relevant facts, not otherwise privileged, within the framework of the rules of evidence." *State v. Hardy*, 293 N.C. 105, 125, 235 S.E.2d 828, 840 (1977); *see also State v. Warren*, 347 N.C. 309, 324-25, 492 S.E.2d 609, 618 (1997), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). During a capital sentencing proceeding, where the Rules of Evidence are not enforced, the trial court has the discretion to admit evidence "as to any matter that the court deems relevant to sentence." N.C.G.S. § 15A-2000(a)(3). Moreover, the trial court must allow the State "to present any competent evidence supporting the imposition of the death penalty." *State v. Heatwole*, 344 N.C. 1, 25, 473 S.E.2d 310, 322 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997).

Based on the foregoing principles, we conclude that the trial court properly exercised its inherent authority to order disclosure of defendant's mental examination reports prepared by witnesses whom defendant planned to call to testify five working days in advance of testimony. Defendant violated the discovery order by failing to furnish Dr. Coleman's report within the prescribed time. Defendant argues that the trial court's ruling prohibiting Dr. Coleman's testimony violated his due process rights by depriving him of any opportunity to fully present relevant evidence in mitigation. This argument is without merit. Defendant had two other mental health experts available, whose testimony would have been fully admissible at the sentencing proceeding, through which to introduce mitigation evidence. Further, defendant's assertion that the disclosure of Dr. Coleman's report to the prosecutor would have allowed the prosecutor to call Dr. Coleman as a witness to testify that defendant possessed the capacity to form the specific intent to kill is unfounded. Dr. Coleman assessed defendant's mental state more than a year after

the murder, and her assessment concentrated only on mitigation. Defendant clearly made a tactical decision not to disclose Dr. Coleman's report until after the guilty verdict; therefore, he cannot show that he was prejudiced by the trial court's ruling. Accordingly, we conclude that the trial court did not abuse it discretion in excluding Dr. Coleman's testimony. This assignment of error is overruled.

[35] By his next assignment of error, defendant contends that the trial court erred in refusing to allow him to make a complete offer of proof of the proposed testimony of Dr. Coleman. Specifically, defendant argues that the trial court, while allowing Dr. Coleman's two-page report, refused to allow "a lengthy testimony" about the records Dr. Coleman relied upon in reaching her conclusions and opinions. We disagree.

The trial court admitted into evidence Dr. Coleman's report of her complete psychological assessment of defendant. The trial court also directly examined Dr. Coleman "on voir dire for appellate purposes" regarding "procedural matters." Thereafter, defense counsel asked Dr. Coleman on *voir dire* to identify her report and then introduced the report into evidence. After the prosecutor cross-examined Dr. Coleman on *voir dire*, the trial court gave defendant the opportunity to question Dr. Coleman further; but defendant asked no other questions. After the trial court disallowed Dr. Coleman's testimony as a result of defendant's discovery order violation, the following exchange occurred between the trial court and defense counsel:

> [DEFENSE COUNSEL]: Judge, we need to make a proffer for the record as to what [Dr. Coleman's] testimony would be.
>
> THE COURT: Well, that's on Exhibit 28. What further thing would you do. You're welcome—
>
> [DEFENSE COUNSEL]: There's some—
>
> THE COURT: You're welcome to do it. I just—
>
> [DEFENSE COUNSEL]: There's some other records that she used in reaching the conclusions and the opinions that she reached.

The trial court sustained the prosecutor's objection to the admission of the records. The trial court also told defense counsel that it would allow "a lengthy testimony" by Dr. Coleman only if defense counsel could cite an appellate rule or case requiring it.

**STATE v. BRAXTON**

[352 N.C. 158 (2000)]

In order to preserve for appellate review the exclusion of evidence, a party must provide "a specific offer of proof . . . unless the significance of the evidence is obvious from the record." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985). An offer of proof is essentially "the *substance* of the evidence." N.C.G.S. § 8C-1, Rule 103(a)(2) (emphasis added). The State argues, and we agree, that this rule does not contemplate an extensive offer of proof. Defendant has not cited, nor does our research disclose, a case or any other rule requiring a more extensive offer of proof, namely, Dr. Coleman's entire testimony, than that allowed by the trial court. The record reveals that the trial court gave defendant ample opportunity on *voir dire* to question Dr. Coleman about the substance of her report. Dr. Coleman described the records which defendant sought to admit as follows:

> I was provided with birth records and prior medical records, the medical and mental health records from Central Prison, some— an initial draft of life chronology, and some other family history from Ms. [Deborah] Keith [defendant's mitigation expert]. I received the forensic evaluation report from Dorothea Dix Hospital. I also had some letters that [defendant] had written to his mother that had been collected.

We conclude that this excerpt constitutes a sufficient showing of the substance of the records for a complete offer of proof as required by N.C.G.S. § 8C-1, Rule 103(a)(2). Further, defendant was not prejudiced by the exclusion of Dr. Coleman's testimony since the records would have been admissible independently of her testimony as relevant evidence of defendant's character. This assignment of error is overruled.

**[36]** Defendant next contends that the trial court erred by failing to submit the mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2). Defendant argues that sufficient evidence existed, even absent the excluded testimony of Dr. Strahl and Dr. Coleman, upon which a jury could have reasonably found this mitigating circumstance to exist. We disagree.

A trial court must submit "to the jury any statutory mitigating circumstances which the evidence would support regardless of whether the defendant objects to it or requests it." *State v. Zuniga*, 348 N.C. 214, 216, 498 S.E.2d 611, 612 (1998). Defendant has the burden to produce " 'substantial evidence' tending to show the existence of a miti-

gating circumstance before that circumstance will be submitted to the jury." *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

Here, the evidence does not support defendant's contention that he suffered from a mental or emotional disturbance at the time of the murder. Defendant testified that he had become "real paranoid" after being on lockup for almost two years. Defendant was then transferred to a bunk in the common area of block E where he became "real nervous" about his personal property being stolen. Defendant was finally given a single cell in block A and was assigned to work in the fields picking vegetables. Defendant also testified that he always carried a knife for his personal safety and to enforce order at his card games. The State argues, and we agree, that the reasons for which defendant carried a knife suggested a rational state of mind as opposed to a mind oppressed by extreme paranoia and fearfulness. Defendant further testified that, earlier in the day of the murder, the victim had tried to provoke defendant into an argument and had flashed a knife at him. When defendant entered the shower area, the victim made an obscene comment to defendant. Defendant told the victim, "I'm about burned out on your mouth"; and the victim told defendant to "come on up here and get some then. I got something for you anyway." Sheer anger or the inability to control one's temper "is neither mental nor emotional disturbance as contemplated by this mitigator." *State v. Strickland*, 346 N.C. 443, 464, 488 S.E.2d 194, 206 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). Defendant further testified that he attacked the victim with his knife since he had previously heard that the victim himself had a knife; defendant testified "I felt like if I didn't try to do something, then I'd have been in the situation where I would have been stabbed up, and I probably been dead." Contrary to defendant's contention, this explanation reveals that defendant did not possess a mental or emotional disturbance at the time of the murder; rather, defendant was in a rational, calculating state of mind. Taking all the evidence as a whole, we conclude that the trial court did not err in declining to submit the (f)(2) mitigating circumstance to the jury.

[37] Defendant also contends that the trial court erred by not submitting the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6). Again, we disagree.

The (f)(6) mitigating circumstance "has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions." *State v. Syriani*, 333 N.C. 350, 395, 428 S.E.2d 118, 142-43, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). The record is devoid of any evidence that defendant's paranoia and fear of violence from the prison environment so impaired him as to prevent him from understanding the criminality of his conduct or that it affected his ability to control his actions. To the contrary, defendant testified that he had completed a psychology course and had obtained a "4.0" grade. Defendant also owned and operated a canteen, card games, and a loan business, all of which were illegal or against prison regulations. On the afternoon of the murder, defendant had been playing a card game. Defendant testified that he pulled his knife in the shower when he approached the victim since he had previously been told that the victim had been given a knife. This evidence does not show that defendant had a mental disorder "to the degree that it affected the defendant's ability to understand and control his actions" at the time he committed the murder. *Id.* Therefore, we conclude that the trial court did not err in declining to submit the (f)(6) mitigating circumstance. These assignments of error are overruled.

In his next argument defendant contends that the trial court erred by failing to intervene *ex mero motu* when the prosecutor made grossly improper closing arguments. We disagree. Defendant did not object to these arguments at trial. When a defendant fails to object to an allegedly improper closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*. *See Trull*, 349 N.C. at 451, 509 S.E.2d at 193. In a capital trial, the prosecutor is given wide latitude during jury arguments, *see Warren*, 348 N.C. at 124, 499 S.E.2d at 456, and has a duty to vigorously present arguments for the sentence of death using every legitimate method, *see State v. Daniels*, 337 N.C. 243, 277, 446 S.E.2d 298, 319 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). We now address each argument in turn.

[38] Defendant first argues that the prosecutor's use of biblical references diminished the jury's sense of responsibility for recommending the death sentence. The prosecutor argued, in pertinent part, as follows:

Let me tell you, ladies and gentlemen, that this case, just like the verdict in this case, the sentence that is recommended in this case will be recommended by the law of North Carolina, not biblical law, but the law of North Carolina.

But the Holy Book is always a good place to go for guidance in serious matters. And when I stand before people who quite possibly might know the Bible better than I do, it's a little intimidating.

But because of the order of arguments, ladies and gentlemen, we cannot presume what the defendant's lawyers may say to you. As a matter of fact, we can't worry about it. And I will not stand up here and tell you what the defendant's lawyers are going to say, and I hope that they would afford me the same courtesy.

But it may be said to you, ladies and gentlemen, that in the twentieth chapter of Exodus, it says thou shalt not kill. You may hear that. And you may know that it's in the Holy Book.

The prosecutor then proceeded to quote various verses of the Bible to support his argument that the Bible does not prohibit the death penalty. The prosecutor continued as follows:

So I hope nobody has the gall to stand here and tell you that the law of North Carolina is against the Bible. I want to assure you again that this case, and luckily for this defendant, this case will not be decided by biblical law. Even the order of arguments . . . in this case is as his Honor has said this morning, as is by law provided.

So are you now saying—ladies and gentlemen, are you saying to yourself, well, we are now determining the defendant's fate? That is, the law has given us the duty to determine the defendant's fate? The answer to that is no. The defendant by his own conduct has determined his fate.

Once you listen to the aggravating circumstances in this case and the mitigating circumstances which will be advanced to you, it will determine [sic] that it's the defendant who has determined his own fate.

Regarding biblical references in closing arguments, we recently stated:

We continue to hold that it is not so grossly improper for a prosecutor to argue that the Bible does not prohibit the death penalty as to require intervention *ex mero motu* by the trial court, *but we discourage such arguments.* We caution all counsel that they should base their jury arguments solely upon the secular law and the facts. Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials. Although we may believe that parts of our law are divinely inspired, it is the secular law of North Carolina which is to be applied in our courtrooms. Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from [its] sole and exclusive duty to apply secular law.

*State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643 (citations omitted), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 162 (1999). "This Court has distinguished as improper remarks that state law is divinely inspired . . . or that law officers are 'ordained' by God." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

The prosecutor properly emphasized at the beginning of his closing argument that defendant's sentence would be recommended based upon the "law of North Carolina, not biblical law." Also, defendant's argument that the prosecutor improperly implied that the Bible required death upon a determination that a murder occurred is without merit. In *State v. Oliver*, 309 N.C. 326, 359, 307 S.E.2d 304, 326 (1983), we held that the prosecutor's argument that the death penalty of North Carolina was consistent with the Bible was permissible. As in *Oliver*, the prosecutor here made a similar argument, stating, "I hope nobody has the gall to stand here and tell you that the law of North Carolina is against the Bible." Defendant further argues that the prosecutor's argument diminished the jury's responsibility in recommending the death sentence by stating that "defendant by his own conduct has determined his fate." To the contrary, the statement, taken in context, informs the jury of its duty to consider the evidence supporting the aggravating and mitigating circumstances as well as defendant's conduct. Moreover, we have found such arguments proper. *See, e.g., State v. Anderson*, 350 N.C. 153, 189, 513 S.E.2d 296, 318 (argument that defendant "signed her own death warrant" was not improper), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 326 (1999).

STATE v. BRAXTON

[352 N.C. 158 (2000)]

We note that, as anticipated by the prosecutor, defense counsel in his closing argument stated the following:

> What would Jesus do? He was a victim of capital punishment at the hands of the State. He said as he was hung on the cross, Father, forgive them, for they know not what they do.

> What would Jesus say? Would Jesus pull the switch or administer the lethal injection? I don't think so on the basis of what he taught. He taught blessed are the merciful, for they shall obtain mercy.

> When the State engages in capital punishment, it assumes a god-like posture. And, again, my Bible tells me you should not have no other gods [sic] before me.

> Only God should have the power to give and take life and that in due season and according to his own plan.

Defendant also used ideas from a letter from Reverend Jesse Jackson and quoted from a letter by Mrs. Coretta Scott King regarding the death of her husband, Dr. Martin Luther King. Accordingly, we conclude that the trial court did not err in failing to intervene *ex mero motu* to prevent the prosecutor's biblical references. *See Daniels*, 337 N.C. at 279, 446 S.E.2d at 320-21; *Oliver*, 309 N.C. at 359-60, 307 S.E.2d at 326.

[39] Defendant also contends that the prosecutor misstated the law on four separate occasions during his closing argument by informing the jurors that it was their duty to determine whether any of the "29 so-called mitigating circumstances" had mitigating value. Defendant further argues that the prosecutor made no distinction between the statutory mitigating circumstance of defendant's age, the catchall circumstance, and the twenty-seven nonstatutory mitigating circumstances. The thrust of defendant's argument is that the jury may not have understood that the statutory mitigating circumstance of age has mitigating value as a matter of law. We disagree.

Referring to the twenty-nine mitigating circumstances at the beginning of his argument, the prosecutor stated:

> It is for you to determine, number one, whether these circumstances in fact mitigate, and number two, whether they even exist. That's your job as by law provided.

Discussing the evidence supporting the mitigating circumstances, the prosecutor stated:

> The first one, though, I must say is a statutory mitigating circumstance, that is, the age of [defendant] at the time of the crime. But this doesn't mean his chronological age. This means his age and his life experience.

The prosecutor then argued extensively that the evidence did not support this statutory mitigating circumstance. Thereafter, referring to the nonstatutory mitigating circumstances, the prosecutor stated, "Now we move to the creative ones." Thus, the prosecutor informed the jury of the difference between the statutory mitigating circumstance and the nonstatutory mitigating circumstances.

The prosecutor's first comment was a misstatement of the law; however, the subsequent comments accurately reflected the distinction between statutory and nonstatutory mitigating circumstances. We are not persuaded that the sentencing hearing was so infected with unfairness by the prosecutor's comments as to violate defendant's due process rights. *See Daniels,* 337 N.C. at 276, 446 S.E.2d at 318-19 (defining gross impropriety requiring *ex mero motu* intervention). Moreover, the trial court properly instructed the jury regarding its consideration of both the statutory and nonstatutory mitigating circumstances. Accordingly, these assignments of error are overruled.

[40] In his next assignment of error, defendant contends that the trial court erred by prohibiting defense counsel from quoting from secular sources in his closing argument. Specifically, defendant argues that the trial court acted under a double standard by allowing the prosecutor to quote the Bible while prohibiting defense counsel from quoting from Reverend Jesse Jackson. We disagree.

Defense counsel stated as follows:

> I want you to remember the same death penalty law that was applied in Fayetteville, North Carolina, when you had those two people, those two Marine army enlistees that went out and killed those African American people.

> [PROSECUTOR]: Objection to arguing facts not in evidence, Your Honor.

> THE COURT: Don't do that, counsel. Move along. Go ahead.

**STATE v. BRAXTON**

[352 N.C. 158 (2000)]

Defense counsel continued as follows:

> Well, I know that once upon a time there were certain laws on our books that prohibited us from doing certain things, laws that were sanctioned by the same State of North Carolina that's here asking you to consider and give the death penalty.

> And the laws that I'm talking about are those laws that required that we sit at the back of the bus, some of our citizens, and those laws that required that some of us couldn't serve on jury duty. That's the same law I'm talking about, the same law that said certain schools we couldn't attend.

> I'm talking about the same State of North Carolina that's asking that—that enforced those particular laws are asking you to enforce the death penalty law.

> Do you want to know the funny thing about those other laws justified on the Bible? Somewhere in there it was mandated that the races should be apart.

The prosecutor objected, and the trial court sustained the objection. Outside the presence of the jury, the trial court admonished defense counsel to "not argue anything—evidence, cases, ideology, anything like that—that is a factual or legal matter outside of this case." Defense counsel then informed the trial court that he planned to read a letter written by Reverend Jesse Jackson to the "Faith Community" in South Carolina making a moral appeal for the life of Susan Smith, a woman who murdered her two young children and initially blamed a black man. Outside the presence of the jury, defense counsel read the letter to the trial court. The trial court ruled as follows:

> If you wish to quote Reverend Jackson or if you wish to quote Jesus Christ and it's general statements—I'm referring now to Reverend Jackson—you may do that. You may do that with the Savior.

> However, you may not read that letter. You may not refer to the events of Burmeister, of Susan Smith's murder of her children, what the jury did or didn't do, of people caught or not caught, or of people executed or not executed, because it's not this case.

> Now, do you want to take a five-minute break and get your thoughts together and find out if there's one or two quotes and

run them by me of Reverend Jackson's? If they're fine, I'll allow it. If not, you're going to have to summarize it the best you can and move on to another topic.

Thereafter, defense counsel told the trial court that he would use ideas from the letter, not any quotes.

Defense counsel further argued the following:

Coretta Scott King, the wife of Dr. Martin Luther King, knew that adding violence to violence would not bring relief. She indicated that although my husband was assassinated and my mother-in-law was murdered, I refuse to accept the cynical judgment—

[PROSECUTOR]: The State would have to object. He's arguing facts not in evidence.

THE COURT: Finish it. Overruled. Finish the quote.

[DEFENSE COUNSEL]: I refuse to accept the cynical judgment that killers deserve to be executed. To do so would perpetrate the tragic cycle of violence that feeds upon itself.

THE COURT: I sustain the part of comparing this case with her husband's case. I overrule her views of capital punishment that you're quoting.

. . . Proceed.

[DEFENSE COUNSEL]: To do so will perpetrate the tragic cycle of violence that feeds upon itself. It will be a disservice to all that the Bible stands for and all that we live for to ask that you take a life for the fact that a life had been taken.

"Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999). "[C]ounsel may not read the facts contained in a published opinion together with the result to imply that the jury in his case should return a favorable verdict for his client." *State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986). Control of the jury argument remains within the sound discretion of the trial court. *See State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992).

Based on the foregoing principles, we conclude that the trial court afforded defense counsel ample opportunity to argue using ideas and quotes from secular sources and properly prohibited counsel from arguing the facts of other cases. The facts of the other cases are not pertinent to any evidence presented in this case and are, thus, improper for jury consideration. *See Guevara*, 349 N.C. at 257, 506 S.E.2d at 721. Accordingly, we overrule this assignment of error.

**[41]** By another assignment of error, defendant contends that the trial court erred by failing to clearly instruct the jury that statutory mitigating circumstances have mitigating value. Defendant argues that "in its initial instructions about the statutory circumstances, the trial court was completely silent about whether those circumstances were deemed by law to have mitigating value." Defendant further argues that the instructions given did not impress upon the jury that the statutory mitigating circumstance of age should be considered differently from the catchall or the remaining twenty-seven nonstatutory mitigating circumstances. We disagree.

Defendant did not object to the instructions at trial; therefore, our review is limited to plain error. N.C. R. App. P. 10(b)(2). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998).

"If a juror determines that a statutory mitigating circumstance exists, . . . the juror must give that circumstance mitigating value. The General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value." *State v. Jaynes*, 342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995) (citations omitted), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). However, that "does not mean that the trial court is required to instruct that statutory mitigating circumstances have value as a matter of law." *Davis*, 349 N.C. at 55, 506 S.E.2d at 485.

Defendant cites *Jaynes*, 342 N.C. at 286, 464 S.E.2d at 470, to support his position. However, the trial court's instructions here are different from the instructions in *Jaynes*, where this Court found error in the trial court's instructions that, in effect, told the jurors that "they could elect to give no weight to statutory mitigating circumstances they found to exist." *Id.* We stated that such instruction was

"contrary to the intent of the statute and settled case precedent." *Id.* Further, this Court has considered and rejected an argument similar to defendant's in *Davis,* 349 N.C. at 57, 506 S.E.2d at 485-86.

Here, the trial court instructed the jury with regard to the statutory mitigating circumstance of age, in part, as follows:

> I charge you on that that the mitigating effect of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence.
>
> . . . .
>
> If one or more of you find[] by a preponderance of the evidence that the circumstance exists, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form.
>
> If none of you finds this circumstance to exist, you would so indicate by having your foreperson write "no" in that space.

With respect to all of the nonstatutory mitigating circumstances, the trial court instructed the jury, in part, as follows:

> You should also consider the following circumstances arising from the evidence which you find have mitigating value:
>
> If one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to have mitigating value, you would so indicate by having your foreman write "yes" in the space provided.
>
> If none of you finds this circumstance to exist or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in that space.

The trial court also gave a virtually identical instruction after setting out each nonstatutory mitigating circumstance.

With respect to the statutory catchall mitigating circumstance, the trial court instructed the jury as follows:

> Finally, you may consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value.
>
> . . . .

So if one or more of you so find[] by a preponderance of the evidence, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form.

If none of you find any such circumstance to exist, you would so indicate by having your foreperson write "no" in that space.

As we noted in *Davis*, "[t]hese instructions properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law." 349 N.C. at 56, 506 S.E.2d at 485. We conclude the same in this case. Accordingly, the trial court did not commit error, much less plain error, in the instructions; and we overrule this assignment.

## PRESERVATION ISSUES

Defendant raises nine additional issues that have previously been decided contrary to his position by this Court: (i) whether the trial court erred by using the term "may" in sentencing Issues Three and Four; (ii) whether the death penalty statute is unconstitutionally vague and overbroad and imposed in a discretionary and discriminatory manner; (iii) whether the trial court erred in removing prospective jurors for cause who could fairly and impartially decide the case without allowing defendant an opportunity to ask further questions; (iv) whether the trial court erred in allowing death-qualification of the jury by excusing for cause certain jurors who expressed an unwillingness to impose the death penalty; (v) whether the trial court erred in using the word "satisfy" in the jury instructions for defining defendant's burden of proof applicable to mitigating circumstances; (vi) whether the trial court erred when it instructed the jury that it was to decide whether any of the nonstatutory mitigating circumstances had mitigating value; (vii) whether the trial court erred in instructing the jury on an unconstitutionally narrow definition of mitigation; (viii) whether the trial court erred when instructing the jury on Issues Three and Four that it "may" consider mitigating circumstances that it found to exist in Issue Two; and (ix) whether the trial court erred when it instructed the jury that it must be unanimous to answer "no" at Issues One, Three, and Four.

Defendant raises these issues for purposes of urging this Court to reexamine its prior holdings and also for the purpose of preserving the issues for any possible further judicial review. We have consid-

ered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY

Finally, this Court has the exclusive statutory duty in capital cases to review the record and determine (i) whether the record supports the aggravating circumstances found by the jury; (ii) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Having thoroughly reviewed the record, the transcripts, and the parties' briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no suggestion that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Accordingly, we turn to our final statutory duty of proportionality review.

The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation. At defendant's capital sentencing proceeding, the jury found the eight aggravating circumstances submitted: that the murder was committed by a person lawfully incarcerated, N.C.G.S. § 15A-2000(e)(1); that defendant had been previously convicted of the first-degree murder of Emmanuel Oguayo, N.C.G.S. § 15A-2000(e)(2); that defendant had been previously convicted of the first-degree murder of Donald Ray Bryant, N.C.G.S. § 15A-2000(e)(2); that defendant had been previously convicted of robbery with a dangerous weapon of Susan Indula, N.C.G.S. § 15A-2000(e)(3); that defendant had been previously convicted of robbery with a dangerous weapon of Lindanette Walker, N.C.G.S. § 15A-2000(e)(3); that defendant had been previously convicted of robbery with a dangerous weapon of Emmanuel Oguayo, N.C.G.S. § 15A-2000(e)(3); that defendant had been previously convicted of robbery with a dangerous weapon of Donald Ray Bryant, N.C.G.S. § 15A-2000(e)(3); and that defendant had been previously convicted of second-degree kidnapping of Donald Ray Bryant, N.C.G.S. § 15A-2000(e)(3).

Two statutory mitigating circumstances were submitted but not found: (i) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (ii) the catchall, N.C.G.S. § 15A-2000(f)(9). Of

the twenty-seven nonstatutory mitigating circumstances submitted, the jury found that four had mitigating value.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. We have determined the death penalty to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

[42] Several characteristics in this case support the determination that the imposition of the death penalty was not disproportionate. Defendant was convicted of premeditated and deliberated murder. We have noted that "the finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506. Further, "[i]n none of the cases in which the death penalty was found to be disproportionate has the jury found the (e)(3) aggravating circumstance." *State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143 (1999), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 1087 (2000). "The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate." *State v. Lyons*, 343 N.C. 1, 27, 468 S.E.2d 204, 217, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). In this case, the jury found aggravators pertaining to two previous capital felonies and five previous violent felonies. Further, the facts show that defendant repeatedly stabbed a totally defenseless man in the prison shower for money owed him.

In carrying out this statutory duty, we also consider cases in which this Court has found the death penalty proportionate; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Specifically noting defendant's violent past history, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in

which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

We conclude, therefore, that defendant's death sentence was not excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Accordingly, the judgment of death is left undisturbed.

NO ERROR.